### THE VAUGHAN AND TELEGRAPH.

1. Where exceptions of form are taken on a libel in admiralty in the District Court, but are not found in the record of the appeals from the District to the Circuit Court, or from the Circuit Court to this one, and do not appear to have been brought to the attention of the Circuit Court, or acted on in any manner by it, they must be held in this court to have been waived.

2. A bill of lading indorsed and sent to the consignees, who make, on the receipt of it, advances on the cargo, gives the consignees sufficient title to maintain a libel in admiralty against a vessel by whose tortious collision with the vessel in which the cargo consigned to them was coming, the cargo has been wrecked and lost.

3. A cargo was shipped from Canada to New York, October 7th, 1864, when gold was 101 per cent. above legal tender notes of the United States. The cargo was wrecked soon after, on the Hudson. On libel in the admiralty at New York, and on appeal from the District Court, the Circuit Court, on the 26th March, 1870, when $100 gold was only 12 per cent. above notes, gave the libellants a decree for the value in gold of the cargo on the day and at the place of shipment, converting that value, at the same time, into legal tender notes, at the rate at which such notes stood as compared with gold on the day of shipment; that is to say, when gold was 101 per cent. above legal tender notes, or, in other words, when it required $201 legal tender notes to buy $100 of gold. On appeal to this court (the difference between gold and notes having now sunk to about 9 per cent.), held that this decree was right.

ON the 7th of October, 1864, O. & J. Lynch, of St. Timothy, a place (near Montreal) in Canada East, shipped a cargo of barley on board a canal-boat which was about to sail through different canals and waters into the upper part of the Hudson and go thence to New York. The Lynches were correspondents of Gordon, Bruce & McAuliffe, commission merchants of New York, and this barley was in fact consigned to them.

The cargo was worth on that day, at St. Timothy's, $2436 *in gold*, or at the then rate of depreciation, about $4896.30 in legal tender notes of the United States; at that time so much below the value of gold as that it required $2.01 of them to buy $1 of gold. The Lynches received a bill of lading

making the barley deliverable " on the order of O. & J. Lynch, or to their assigns," which bills they thus indorsed:

"Deliver to the order of Gordon, Bruce & McAuliffe.

"O. & J. LYNCH."

Thus indorsed, the bills were forwarded to Gordon, Bruce & McAuliffe, at New York, who on receipt of them advanced the premium for insurance, the consignors being then indebted to G., B. & McA. for some advances previously made.

The canal-boat arrived safely at Troy, on the Hudson, where she was taken in tow with other boats—she on the port side—by the steamer Mary Vaughan. The steamer went down the river with her tow, and on the night of the 26th October, a clear, starlight night, in calm weather, the tide near its change, and therefore feeble—when in that broad, straight, deep reach of the Hudson, where Butter Hill announces the presence of the Highlands—she saw another steamer, the Telegraph, coming up the river, she also with a tow, and the lights of the two steamers being visible to each other for more than a mile. No intervening objects interfering with the safe and easy transit, nothing but the grossest negligence, or, what would seem more probable, a determination by each boat that the other should give way to her, could have brought them together; nevertheless they did come together, and with such force that the canal-boat was wrecked, her cargo sunk mid-river; the crew just escaping with their lives.

Hereupon Gordon, Bruce & McAuliffe, alleging themselves to be the consignees of the barley, libelled in one libel both the steamers in the District Court at New York. The libel alleged that the Mary Vaughan moving down the river Hudson with her tow (describing it), the canal-boat being securely fastened on the port side of the steamer, and propelled, governed, and controlled in all respects by her movements, on the morning of the 26th October, 1864, encountered in the Highlands the Telegraph, moving up with her tow (also described); that a barge on the port side of the Telegraph, in all respects propelled, governed, and con-

trolled by the Telegraph, "came in collision with and struck the canal-boat near her bow with great violence, parting the fasts that held her to the Vaughan, staving in her bow, and causing so much damage and injury to her that in about fifteen minutes she went down in water from 100 to 200 feet deep, . . . and that the loss was caused by the negligence, want of skill, and improper conduct of the persons navigating the Mary Vaughan, or by the negligence, want of skill, and improper conduct of the persons navigating the Telegraph, or by their joint negligence, fault, and improper conduct, and not by the fault, negligence, or improper conduct of the persons on board the canal-boat."

The case coming on to be heard in the District Court exception was taken there by the Vaughan—

1st. That the statement of facts upon which the libellants relied was not sufficiently full, by reason of the omission of essential particulars, such as the courses of the respective steamers one to that of the other, their speed, the direction of the wind, the flow of the tide; and again, by the omission to state in what manner the Vaughan was in fault, or improperly managed; that it did not state any fault or negligence on the part of the steamer, nor the acts of commission or omission, upon which the imputation of fault might be founded; all which were required by the practice in admiralty to be stated in plain allegations, to apprise the claimant of the ground of fact upon which relief was sought, that he might admit or take issue thereon, or allege matters in avoidance thereof.

2d. That the libellants could not join in the same libel both steamers, nor maintain a joint libel against them; this exception being taken by both steamers

Both these exceptions of form were overruled and a decree entered against both steamers, charging each with the whole loss of the cargo; fixed at $2924, this value in gold, as already stated, on the day and at the place of shipment. But though the value in gold of the cargo was thus plainly made the basis of the decree in the District Court at New York, yet the decree was not by its terms made payable in

gold, thus apparently leaving it payable in legal tender notes, if they were constitutional.   Appeals were taken to the Circuit Court, nothing being contained in the appeals about the exceptions of form taken in the District Court, nor anything said in the arguments there on those points. The cases were considered on their merits, and on an objection that Gordon, Bruce & McAuliffe showed no sufficient interest in the cargo to sue; and especially on an objection to the entry of the judgment payable in legal tender notes instead of gold or its value in legal tenders.

The Circuit Court, equally with the District Court, held both steamers liable; but reversed the decree because, as it held, the same ought, in order to give full indemnity to the libellants, to have been for the value in legal tender notes ($4896.30), of the $2436 *gold*, which in gold the cargo was worth.   The decree of the Circuit Court was accordingly entered March 26th, 1870, for the $4896.30, with interest added to the date of its entry, in all $6515.51, with costs. One dollar of gold was, at the date of this decree, worth $1.12 in legal tenders.*

An appeal was now taken to this court.

The case coming here, *Mr. C. Van Santvoord, for the owners of the Vaughan, and Mr. F. J. Fithian, for the Telegraph,* pressed, the one or the other, the objections of form which had been urged in the District Court, though not put before the Circuit Court.   They contended then, in opposition to each other, on the merits; the former that the fault had been with the Telegraph, the latter that it had been with the Vaughan. The point was raised and argued in the interest of both steamers, that Gordon, Bruce & McAuliffe had no sufficient interest to sue; that in legal effect the advance of the premium of insurance at the time of the delivery of the bill of lading with the direction indorsed, to be forwarded, and not

---

* At the time this case was argued in this court, January 24th, 1872, the difference between gold and legal tender notes had sunk to about 9 p. c., and on the day when the judgment was given, March 4th, 1872, the difference was about 10 p. c.

as security for the advance, was an advance on advice of the shipment, as in *Sargent* v. *Morris*,[*] for which, as was held in that case, the libellants would have had a lien if the goods had been received by them, but which could have no effect to transfer the property; that the libellants not having the legal title or any property or right of possession at time of loss, and the suit being without the scope of their authority as consignees or agents, for the purpose of sale on arrival in New York, the case did not fall within the rule which allows a consignee or agent for an absent owner to institute a suit for a purpose within the scope of his authority.

But the point most pressed perhaps was the mode in which the Circuit Court had fixed the damages, in regard to which it was said by these counsel, that the Circuit Court should have affirmed the decree of the District Court in its award of damages based upon the value of the barley lost, at the time and place of shipment, St. Timothy, Canada East, in specie or Canadian currency, on a specie basis, in dollars and cents, equivalent to money of that denomination in gold or in the coinage of the United States, with interest from the date of the shipment; or at the most, that the Circuit Court should have decreed the payment in gold, or in the coinage of the United States, of the value at the time and place of shipment, in the currency prevalent there, specie or paper, on a specie basis, with interest. The damages decreed by the District Court, it was said, if short of full indemnity, were so only for the reason that the claimants, under the Legal Tender Act, might pay the decree in legal tender notes. But that a decree for the payment in gold, or coin of the United States equivalent to the specie value at the time of shipment in Canada, with interest from the time of shipment, would be a full indemnity to the Canadian shipper, whose consignees the libellants claim to be. The cases in this court recognizing the existence of two currencies, one specie or gold, and the other paper, and adjudging payment in gold or not, as the justice of the case demands,

---

[*] 3 Barnewall and Alderson, 277.

were, it was said, authorities to the competency of the court to make such assessment and decree;[*] the Legal Tender Acts not having been intended to change the legal standard or measure of value, or rule of damages in judicial proceedings.

*Mr. Samuel E. Lyons, contra :*

The exceptions to form having been abandoned in the appeal to the Circuit Court cannot be renewed.

The case on the merits is clear.

The libellants were consignees, and as such had a right to maintain the action for the injury to the cargo.   In *Fitzhugh* v. *Wiman*,[†] Selden, J., says :

" The consignee of property is in law presumed to be the owner, and if lost *in transitu* or diverted from its destination, suit may be brought, either in his name or that of the real owner."

The decision of the Circuit Court in giving the libellants *indemnity* for their loss was correct.   The rule under which damages in such a case are to be ascertained is stated with exactness in *Smith* v. *Griffith*,[‡] as follows :

" The damages to which the plaintiff is entitled, if any, should afford an adequate *indemnity* for the loss sustained at the time the injury happened.   The fair test of its value, assuming there is no defect in the quality of the article, and consequently of the loss to the owner, if it has been destroyed, is the price at that time in the market."

In this case the property destroyed had a market price, fixed by daily transactions, and it is this price at its exact value on the day of the destruction, in the forum where the judgment is rendered, that is allowed by the decree of the Circuit Court.   This gives the libellants indemnity and no more, while the rule contended for by the appellants would give them a fraction less than one-half the sum of the actual cost of the barley.

---

[*] Bronson v. Rodes, 7 Wallace, 229 ; Butler v. Horwitz, Ib. 258.

[†] 5 Selden, 562.          [‡] 3 Hill, New York, 306, 337.

If the legal tender notes have approximated more in value to gold than they were when the decree in the Circuit Court was entered, that is only because the owners have chosen to appeal.

Mr. Justice SWAYNE delivered the opinion of the court.

On the 25th of October, 1864, the steam propeller Mary Vaughan left the city of Troy for a voyage on the Hudson River to the city of New York. She had in tow two canal-boats laden with cargoes of barley under the deck and hoop-poles upon the deck. The boats were lashed, one on each side of the propeller. The canal-boat R. M. Adams was fastened to the starboard side, and the canal-boat Sherman Lewis upon the port side. They were attached to the propeller by towing lines. The propeller was about sixty tons burden, and ninety feet in length by seventeen wide.

The steamboat Telegraph left her dock at the city of New York about five o'clock in the afternoon of the same day on a voyage up the river to Newburg, having in tow three large heavy freight barges, to wit, the Minnesink lashed to her port side, the Dutchess to her starboard side, and the Insurance lashed to the stern of the starboard barge, Dutchess.

On the morning of the next day, between two and four o'clock A.M., just below Butter Hill, the barge Minnesink, on the larboard side of the Telegraph, and the canal-boat Sherman Lewis, on the port side of the Vaughan, came in collision, whereby the Sherman Lewis was torn from her fastenings to the propeller, swung round crosswise of the river, and across the bow of the Telegraph and her barges, and was so much injured that shortly afterwards she filled and sunk in water from one to two hundred feet deep, carrying down her under-deck cargo with her.

The barley belonged to J. & O. Lynch, of Buharnois, Canada, and was shipped by them from St. Timothy, Canada, in the boat in which it was lost. The boat was bound to Albany or New York. The bill of lading was given to the owners, and by them indorsed as follows: "Deliver to the order of Gordon, Bruce & McAuliffe. O. & J. Lynch."

Gordon, Bruce & McAuliffe were a firm of the city of New York. The bill of lading was then placed in the hands of Gordon & Co., and by them, at the request of the shippers, forwarded to the consignees. Upon receiving it Gordon & Co., as the agents of the consignees, advanced upon it $29.50 for the premium of insurance upon, the barley; the entire arrangement with the shippers was made by Gordon & Co. as such agents. They had special authority to advance upon this particular barley by drafts at thirty days upon the consignees, and so advised the shippers before the bill of lading was forwarded.

This libel was filed by the consignees. It alleged that the disaster was caused "by the negligence, want of proper skill, and improper conduct of the persons navigating the said propeller, or by the negligence, want of proper skill, and improper conduct of the persons navigating said steamboat, or by their joint negligence, fault, and improper conduct."

In the District Court both the claimants excepted to the libel; the claimant of the Vaughan upon the grounds that the particular facts upon which the imputation of fault was founded were not set forth, and that the allegations were not sufficient to entitle the libellants to a decree; the claimant of the Telegraph upon the same grounds, and the further ground that a libel against both vessels jointly could not be maintained. The exceptions were overruled. The court decreed against both vessels, and the claimants of both appealed to the Circuit Court.

The appeals found in the record are wholly silent as to these exceptions. It does not appear that they were brought to the attention of the Circuit Court, or that it took any action whatever upon the subject. The appeals from the Circuit Court to this court are confined to the merits of the case. Neither of them contains any reference expressly, or by implication, to the exceptions. Under these circumstances they must be held to have been conclusively waived by the respondents. To consider them here would be to exercise the appellate power of this tribunal in reviewing the

action, not of the Circuit, but of the District Court. This
we have no power to do. The exceptions must, therefore,
be laid out of view.

It was insisted, in the argument here by the counsel for
the Vaughan that the consignees had no title to the barley,
and hence cannot maintain this libel for its loss. The con-
verse of this proposition is too clear to require discussion.
The transfer of the bill of lading carried the legal title with
it. The authority of Gordon & Co. to draw on the con-
signees for advances upon receiving the bill of lading, and
the actual payment by them as such agents of the premium
for insurance, show such to have been the intention of the
parties.

The presumption of title in the transferee of a bill of
lading which the law raises upon the transfer is, in this case,
fully sustained by the facts developed in the proofs.* But
aside from the special circumstances referred to, we have no
doubt of the right of the consignees as such to maintain this
proceeding. The question is not an open one in this court.
In *Houseman* v. *The Schooner North Carolina*,† Chief Justice
Taney, delivering the opinion of the court, said : " We con-
sider it well settled in admiralty proceedings that the agent
of absent owners may libel either in his own name as an
agent, or in the name of his principals, as he thinks best.
. ... And that the consignees had such an interest in the
whole cargo that they may lawfully proceed in this case, not
only for what belonged to them, and was shipped on their
account, but for that portion also which was shipped by
Porter as his own and consigned to them." In *McKinlay* v.
*Morrish*,‡ it was said, " Whatever may be the uncertainty
concerning the consignee's right to sue in a court of law,
from the conflicting decisions to be found on that right,
there is none that he may sue in a court of admiralty in the
United States."

This brings us to the consideration of the merits of the
case.

---

* Grove v. Brien, 8 Howard, 439; Lawrence v. Minturn, 17 Id. 107.
† 15 Peters, 49.                          ‡ 21 Howard, 355.

The District Court held that both vessels were in fault. The Circuit Court came to the same conclusion, and affirmed this part of the decree of the District Court. These concurring judgments are *primâ facie* to be deemed correct. Our examination of the evidence apart from this consideration has led our minds to the same results. Where the collision occurred the channel was straight, wide, and deep. The night was calm and clear. It was near the end of the ebb tide. No disturbing element was present. The circumstances were as favorable as possible for each vessel to pass the other with its tows in safety. Without the grossest negligence or mismanagement there could be neither peril nor disaster. Yet there was a disaster; and the colliding vessels came together with such violence that the canal-boat was wrecked and sunk. Neither vessel had a lookout. The pilot and engineer of the Vaughan were inexperienced and incompetent. There was at the time no one on the deck of the Telegraph but the captain. The pilot had gone below. The engine was in charge of a fireman. Other special faults in the conduct of each vessel are imputed, and we think the evidence establishes them. The vessels are antagonists; and one remarkable feature of the case is the zeal and ability with which the counsel of each has attacked the other and labored to defend his own. In the former both have been successful; in the latter neither. The evidence is to a large extent confused and contradictory. It could serve no useful purpose to analyze and discuss it. It is sufficient to remark that we could add nothing to the clear and able opinion of the judge of the District Court, by whom this part of the case was there disposed of. We concur in the views which he expressed.

In the District Court it was held that the proper rule of damages where a cargo is lost *in.transitu* by a collision, or other tort, is the value of the goods at the time and place of shipment. It was conceded that upon the breach of a contract for the delivery of goods at a particular place the measure of damages is the full value of the goods at such place. Both propositions are correct and are well settled in

our jurisprudence. The place of shipment was a port in Canada, and the value of the barley there when shipped was found to have been 70 cents per bushel, amounting in the aggregate, with interest, to $2436. The estimate was made in the currency of Canada, which was equivalent in value to the gold coin of the United States. It was admitted that the decree was solvable in legal tender notes, which were then largely depreciated, but it was held that this was an incident of the suit in the forum where it was brought, and that the result was unavoidable. In the Circuit Court the same rule of damages was applied, but the decree gave the value of the Canada currency in legal tender notes. These notes have since largely appreciated, so that while the libellants would, under the decree of the District Court, if it had been paid when rendered, have received much less than the estimated value of the barley, they will now, if the decree of the Circuit Court be affirmed, receive much more.

It is clear that if the decree of the Circuit Court had been paid when it was rendered the result to the respondents would have been the same as if the decree of the District Court had been then affirmed and paid in specie. Upon the rule of damages applied by both courts as respects the kind of currency in which the value of the barley was estimated the libellants were entitled, upon the plainest principles of justice, to be paid in specie or its equivalent. The hardship arising from the decree before us is due entirely to the delay in its payment which has since occurred, and the change which time and circumstances have wrought in the value of the legal tender currency. The decree was right when rendered, and, being so, cannot now be disturbed. It is unnecessary to pursue the subject further. The decree, in the particular under consideration, presents the same question which was decided by this court in the case of *Knox* v. *Lee*.* There the court instructed the jury that in assessing the plaintiff's damages they might take into account the fact that the judgment could be paid in legal tender notes. This

* 12 Wallace, 457.

court upon error affirmed the correctness of that instruction. The authority of that case is conclusive of the question here under consideration.

DECREE AFFIRMED.

The CHIEF JUSTICE, dissenting.

I dissent, and am authorized to say that my brothers CLIFFORD and FIELD also dissent, from so much of the opinion just read as relates to the measure of indemnity for the loss of the barley.

We agree that the loss was through the fault of both boats, and that the libellants were entitled to indemnity; and we agree further that the measure of this indemnity was the value of the barley at the time and place of shipment; and that this value was $2436 in gold. The decree of the District Court, rendered on the 21st day of February, 1868, was for this sum, with interest, making the whole amount of the decree $2924.20.

On appeal, the Circuit Court held that in order to give full indemnity to the libellants, the value in gold must be converted into its equivalent in legal tender notes on the day of shipment. At that time this currency was so much depreciated that $100 in gold were worth $201 in notes. The $2436 in gold, were, therefore, converted into their equivalent in note dollars, making the sum of $4896.36. The decree of the District Court was accordingly reversed, and a decree was entered, on the 26th of March, 1870, for the last-named sum and interest, in all $6515, with costs.

This was much more than indemnity at the date of the decree, and the injustice is still more apparent at this time, when the value of the notes has so much appreciated that the affirmance of the decree of the Circuit Court gives the libellants almost double indemnity.

This case strikingly illustrates the evil consequences of rendering judgments payable in legal tender currency. Hardly anything fluctuates in value more than such judgments. Every day witnesses a change. The judgment debtor gains by depreciation and loses by appreciation.

Doubtless, if the legal tender clauses of the Currency Acts

are constitutional, such judgments may be rendered; but there is nothing in those acts which *requires* that judgments for damages estimated in coin shall be entered otherwise than for coin. On the contrary, we have decided in several cases* that judgments for coin debts may be rendered payable in coin. In the present case the amount of indemnity was ascertained in gold; and, in our judgment, the decree should have been for that amount payable in coin. This would have done exact justice between the parties and would have been in harmony with the principles of the cases referred to. It would have given indemnity, and not double indemnity.

---

* Cheang-kee *v.* United States, 3 Wallace, 320; Bronson *v.* Rodes, 7 Id. 245; Butler *v.* Horwitz, 1b. 259; Trebilcock *v.* Wilson, 12 Id. 687.