## THE THAMES.

1. The contract between a ship and the shipper is that which is contained in the bills of lading delivered to the shipper. The bill retained by the ship or "ship's bill," as it is sometimes called, is designed only for its own information and convenience; not for evidence, as between the parties, of what their agreement was. If it differs from the others, they must be considered as the true and only evidence of the contract.
2. By issuing bills of lading for merchandise, stipulating for a delivery to order, the ship becomes bound to deliver it to no one who has not the order of the shipper. It is no excuse for a delivery to the wrong person's that the indorsee of the bills of lading was unknown, and that notice of the arrival of the merchandise could not be given to him Diligent inquiry for the consignee, at least, is a duty. And if, after inquiry, the consignee or the indorsee of a bill of lading for delivery to order cannot be found, the duty of the carrier is to retain the goods until they are claimed, or to store them prudently for and on account of their owner. He has no right under any circumstances to deliver them to a stranger.
3. The indorsee of a bill of lading may libel the vessel on which the goods· are shipped, for failure to deliver them, though he may be but an agent or trustee of the goods for others; as *ex gr.*, the cashier of a bank.

APPEAL from the Circuit Court for the Southern District of New York; the case being this:

In January, 1868, Alfred Bennett, James Van Pelt, and Gilbert Van Pelt, were merchants doing a commission business in New York under the name of Bennett, Van Pelt & Co. The partner, Gilbert, resided in Savannah, where he was in the habit of purchasing cotton and consigning it to

his firm in New York. In the course of this dealing he bought, on the 28th of January, 1868, one hundred and eleven bales of Brady & Moses, commission merchants in Savannah, for this firm in New York, and on the same day shipped the cotton to New York by the steamship Thames, one of the vessels of a line known as the Black Star Line. Three bills of lading, of the same tenor and date, were issued, each stating that the cotton was shipped by Gilbert Van Pelt, and that it was to be delivered "unto order or to his or their assigns." "And it is expressly understood," the bill of lading went on to say, "that the articles named in this bill of lading shall be at the risk of the owner, shipper, or consignee thereof, as soon as delivered from the tackles of the steamer, at her port of destination, and they shall be received by the consignee thereof, package by package, as so delivered; and if not taken away the same day by him, they may (at the option of the steamer's agents) be sent to store, or permitted to lay where landed, at the expense and risk of the aforesaid owner, shipper, or consignee." Two of the bills were delivered to said Gilbert Van Pelt; the other being retained as the ship's bill of lading. On the same day, in order to procure money wherewith to pay for the cotton, and in compliance with the terms and conditions of the purchase, he drew his draft on his firm in New York for $8300, payable fifteen days after sight, to the order of "Billopp Seaman, cashier," and delivered the draft and the two bills of lading which he had to the said Brady & Moses, who held moneys of the Atlanta National Bank of Atlanta, Georgia, for the purpose of investment in bills drawn on New York, and the draft was discounted for the account of that bank, and the proceeds were applied toward the payment of the cotton. The bill or invoice for the cotton was receipted as if it had been paid for in cash, and the Atlanta Bank was charged with the advances. The two bills of lading were indorsed,

"Deliver B. Seaman, Cashier, or order.

"G. S. VAN PELT."

The point of contest in the case was for what exact pur-
pose the two bills of lading had been delivered to Brady &
Moses, that is to say, whether to stand as security until the
draft of Gilbert Van Pelt should be *accepted,* or whether to
stand until it should be *paid.* Gilbert Van Pelt himself swore
it was given but for the former purpose, and that this was
perfectly understood on both sides. Brady & Moses, on the
other hand, each swore that it was given to stand as se-
curity until the draft should be *paid;* and in this they were
confirmed by the clerk of their house, one Bruen. The
draft and the bills of lading were forwarded to . Billopp
Seaman, under general instructions from the Atlanta Na-
tional Bank, to hold and collect for the credit of the account
of the said Atlanta National Bank.

The Thames arrived in New York late on Sunday after-
noon, February 2d, 1868. Before arrival, the purser had
made out bills for freight, and made out those for freight on
this cotton, to Bennett, Van Pelt & Co. There was a memo-
randum, in writing, at the foot of the ship's bill of lading,
"for Bennett, Van Pelt & Co.;" by whom put there was not
at all explained, further than that it was not in the hand-
writing of any of the ship's agents at Savannah who signed
the bill of lading and made the contract for carriage. The
ships of the Black Star Line, of which, as already mentioned,
the Thames was one, had brought cotton regularly for Ben-
nett, Van Pelt & Co. On Monday morning, February 3d,
the steamer commenced delivering cargo. The one hundred
and eleven bales were delivered on the pier. Bennett, Van
Pelt & Co. sent their carts and took the cotton, paid freight
for it, receipted for it on the ship's bill of lading, and sold
the bulk of it for cash on delivery the day that they got it.

As appeared on the one hand, nothing was done by the
Fourth National Bank in reference to the cotton, or its de-
livery, from the time of the acceptance of the draft, Febru-
ary 1st, 1868, until after its maturity, February 19th, 1868.
On that day, and on that draft, Bennett, Van Pelt & Co.
failed, and the draft was protested for non-payment. On
the other hand it did not appear, except by the testimony of

James Van Pelt, which was contradicted by Billopp Seaman, that he, Seaman, knew of the arrival of the vessel before the cotton was delivered and sold.   On the 19th, after the draft was dishonored, Seaman, by direction of the President of the Fourth National Bank, sent a clerk to the office of the agents of the ship, where he saw the ship's bill of lading, and heard that the cotton had been delivered some days before to Bennett, Van Pelt & Co.   He made no demand. Afterwards, on March 16th, 1868, the bank made a formal demand for it.

Until the inquiries made on February 19th, 1868, the agents of the Thames had no notice, beyond that which the bill of lading itself gave, of any claim to or interest in the cotton in question by any other parties than Bennett, Van Pelt & Co.

It was undisputed that Seaman had no real interest in the cotton, and that it belonged to the Atlanta National Bank, whose sole agent in New York was the Fourth National Bank.

In this state of things Seaman filed his libel in the District Court of New York against the Thames, March 19th, 1868, claiming damages in the sum of $8300 for non-delivery to him, at New York, of the cotton, the bill of lading for which had, as he set forth, and as was not denied, been assigned to him for a valuable consideration.   The owners of the Thames answered the libel and put in issue its material allegations, averring that the cotton was shipped by the Thames for and to be delivered to Bennett, Van Pelt & Co., of New York, and was so delivered in due course and without notice of the claim of the libellant, and that no claim for it was ever made by the libellant until long after such delivery; that the alleged assignment of the bill of lading to the libellant was by way of security for personal obligations of Bennett, Van Pelt & Co., who were solvent merchants, and to whom the libellant looked for payment of such obligations; and that he gave no notice and did no act as assignee of the bill of lading on the arrival of the

vessel or upon the delivery of the cotton, nor until after Bennett, Van Pelt & Co. had become insolvent, and that by his delay and laches he waived and lost all claim against the vessel and her owners.

The District Court, considering that Seaman had a sufficient interest to sue, and holding, upon the evidence, that the delivery of the bills of lading for the cotton was intended to, and did, transfer it to the libellant as a security for the payment of the draft for $8300, decreed in favor of the libellant, and the Circuit Court affirming that decree, the owners of the vessel brought the case here.

*Messrs. Barney, Butler, and Parsons, for the appellant:*

The witnesses do not, indeed, agree as to the purpose for which the bills of lading were transferred, but the *facts* show that it was as security for the acceptance, and not for the payment of the draft. Thus—

1. The draft was a *time* draft, having fifteen days to run, and was taken at the rate of such paper. Van Pelt would have had no motive to buy cotton on credit if his house was not to have the benefit of the purchase till the credit expired.

2. No instructions were given to the Fourth National Bank to deal with the cotton in the interval of fifteen days during which the draft would be running to maturity. The bank actually did nothing to show any interest in the property.

Even if the transfer of the bills of lading was intended to secure the payment of the draft, Seaman was not entitled to hold the vessel and owners for the non-delivery of the goods, inasmuch as by his own laches he suffered the cotton to go into the possession of Bennett, Van Pelt & Co., and to remain in their possession until after their insolvency. The cotton was shipped in the regular course of business on a vessel which formed one of a line of steam packets between New York and Savannah, and which had been engaged in carrying cotton for account of the same shipper and consignees. The vessel knew no other party in interest. Before arriving at New York, the purser made out the freight

bill to Bennett, Van Pelt & Co., assuming in good faith that the cotton was for them.   A memorandum at the foot of the bill of lading, "For Bennett, Van Pelt & Co.," confirmed him in this assumption.   The bill of lading, by its terms, required the consignee to take away goods on the day of the arrival of the vessel at her port of destination, or in default of his so doing the goods were, at the option of the steamer's agents, to be sent to store or left on the steamer's wharf. The vessel arrived on Sunday, and on Monday morning early, notice was given to Bennett, Van Pelt & Co., the only consignees of whom the ship had knowledge, and who came in the usual course of business and took it from the pier, receipting for it.   The firm being solvent, and being regular consignees, and giving their receipt, the non-production of the outstanding bill of lading was not a circumstance to excite suspicion.   Notwithstanding that the bill of lading showed a shipment on a steamer of a regular line at Savannah, January 28th, 1868, which in due course would have brought the goods to the pier in New York about 3d February following, the Fourth National Bank did absolutely nothing until February 19th, and even then made no demand, and took no further action till March 16th.   Bennett, Van Pelt & Co. did not fail until February 19th, 1868.

On this state of facts Seaman took the risk of the continued solvency of Bennett, Van Pelt & Co., and of the possession of the cotton by them.   Although he may have been legally entitled, in the first instance, to the possession, yet it was competent for him by his acts to waive actual possession, and permit the goods to go into the hands of Bennett, Van Pelt & Co., consignees and owners, subject to Seaman's rights.   Had he intended to avail himself of the rights of a consignee of the cotton under the bill of lading, he should have looked after the property and asserted such right.   A consignee, by refusing or failing to accept the consignment, and look after the property, disclaims and loses the position of consignee.   By failing to assert his rights as consignee until after the insolvency of Bennett, Van Pelt & Co. had intervened, Seaman lost all recourse, except as against them.

They were liable to him in trover for the value of the goods if they took them from the ship without right. The ship's agent having acted in good faith, and Seaman having clearly been guilty of laches, the ship should not be visited with the consequences of his neglect.

3. Seaman was not entitled to maintain this action. He was not the real party in interest, nor had he such title to or interest in the case as to entitle him to sue in admiralty. The Fourth National Bank, the real agent and representative of the Atlanta National Bank, and not the cashier, was the only party entitled to bring the suit.*

The indorsement of commercial paper to and by a bank cashier is the act of his bank and not his individual act, and the libellant having no individual property or interest did not stand in any such relation to the transaction as to enable him to proceed.†

*Mr. B. F. Lee, contra.*

Mr. Justice STRONG delivered the opinion of the court.

The engagement of the ship with the shipper was to deliver the cotton in New York to order. In regard to this there is no doubt. Such was the express stipulation of the bills of lading, which were given on the 28th of January, 1868, when the cotton was received on shipboard. On that day Gilbert Van Pelt purchased the cotton in Savannah from Brady & Moses, and settled for it by giving in payment his draft upon the firm of Bennett, Van Pelt & Co., in New York, of which firm he was a member. The draft was drawn at fifteen days' sight in favor of the libellant, Billopp Seaman, cashier, or order, and it was discounted by Brady & Moses with money of the Atlanta National Bank, which they had in hand for the purpose of purchasing bills on New York on the bank's account. The price of the cotton was

---

* Houseman v. Schooner North Carolina, 15 Peters, 40; McKinley v. Morrish, 21 Howard, 355.

† Bank of Genesee v. Patchin Bank, 19 New York, 312; Folger v. Chase, 18 Pickering, 63; Watervliet Bank v. White, 1 Denio, 608.

thus, in substance, paid by money which Van Pelt obtained from the bank, as the proceeds of his draft. At the time when he drew the draft he also indorsed upon the bills of lading which the ship had given for the cotton, an order directing its delivery to Billopp Seaman, cashier, in whose favor the draft was drawn, and delivered them with the draft to Brady & Moses. They were made out in triplicate, as is usual, and, by them all, the ship undertook to deliver the cotton shipped *to order*. Two of them had been delivered to Van Pelt, the shipper, and the third was retained by the ship. That retained by the ship, it is true, when produced at the trial in the court below, was found to have, at its foot, the memorandum, " for Bennett, Van Pelt & Co.," which is not upon those delivered to the shipper. How that memorandum came there is not explained. No witness has testified in whose handwriting it is, but it is proved not to have been in that of any of the ship's agents at Savannah who signed the bills of lading and who made the contract for carriage. This, however, is of little importance. The contract between the ship and the shipper is that which is contained in the bills of lading delivered. The ship's bill was designed only for its information and convenience; not for evidence, as between the parties, of what their agreement was. If it differs from the others, they must be considered as the true and only evidence of the contract.

The proofs in the case leave no reasonable doubt that the bills of lading were indorsed to the libellant in order to transfer to him the cotton as a security for the payment of the draft at its maturity. Gilbert Van Pelt alone asserts the contrary. His testimony, it must be admitted, tends to show that they were indorsed and received as security for the acceptance only of the draft. But he is directly contradicted by Moses, by Brady, and by Bruen, neither of whom has any interest in this controversy, and all of whom state that the bills of lading were indorsed to secure to Seaman the payment of the draft and not merely its acceptance. Besides, their testimony is in harmony with all the probabilities of the case. It is absurd to talk of security for the acceptance

of the draft. No such security was needed. It might have been accepted before it was discounted. Gilbert Van Pelt was a member of the firm upon which it was drawn, and he was at hand when it was discounted. He might then have accepted it. In addition to this it is significant that the invoice of the sale from Brady & Moses to Van Pelt was made out and receipted as if paid in cash (the draft having been turned into cash by a deduction of discount and exchange), and the advances made upon the draft were at once charged to the Atlanta National Bank. In view of all this it is incredible that the bills of lading were indorsed to Seaman merely to secure what the maker of the draft could have given on the instant. Nor ought the position of Gilbert Van Pelt to be overlooked. If the bills of lading were indorsed as security for payment of this draft, his firm has obtained from the ship delivery of the cotton through a fraudulent representation that they were the consignees, or entitled to the delivery of possession, and they sold it for cash on the day when it was thus wrongfully obtained. He is not, therefore, an unbiased witness. His testimony was given while he was under the influence of a temptation, not unnatural, to vindicate his firm from the guilt of fraudulently abstracting a large amount of property from its rightful owner. Standing as he does, in such a position, his statements are not to be credited when in conflict with the positive testimony of Brady, of Moses, and of Bruen, and when inconsistent with the strong probabilities of the case.

It must be considered, then, that by the indorsement of the bills of lading the libellant became the owner of the cotton, and that by force of the contract with the ship it was deliverable at New York only to him, or to his order. Reference to authorities to show that the effect of the indorsement was to vest such ownership in Seaman is quite unnecessary. We may, however, refer to a few.*

---

* Conrad v. The Atlantic Insurance Company, 1 Peters, 445; Gibson v. Stevens, 8 Howard, 384; Thompson v. Dominy, 14 Meeson & Welsby, 403; Caldwell v. Ball, 1 Term, 205; Wright v. Campbell, 4 Burrow, 2051; 1 Lord Raymond, 271; Walter v. Ross, 2 Washington's Circuit Court, 283.

The ship arrived with the cotton at the port of New York on Sunday, the 2d day of February, 1868, late in the afternoon, and on the morning of the 3d delivered it to Bennett, Van Pelt & Co. on their demand, without the production of either of the bills of lading which had been given to the shipper, and without any order from Billopp Seaman, who was the indorsee of the bills, and to whom alone, or to whose order, it could rightfully be delivered. It does not appear that any notice of the ship's arrival was given to Seaman, or that the ship made any inquiry to ascertain to whom the cotton was deliverable. It would seem that assuming the mysterious memorandum on the bill of lading retained by the ship was equivalent to an order to deliver to Bennett, Van Pelt & Co., no demand was made for the presentation of such an order, and no further inquiry for the consignee was set on foot. The consequence was that Bennett, Van Pelt & Co., having obtained the property without any right to it, sold it for cash on the day it was delivered to them, and failed within a few days afterwards.

No argument is needed to show, what is most manifest, that the delivery which was thus made was a breach of the ship's contract. By issuing bills of lading for the cotton, stipulating for a delivery to order, the ship became bound to deliver it to no one who had not the order of the shipper, and this obligation was disregarded instantly on the arrival of the ship. And it is no excuse for a delivery to the wrong persons that the indorsee of the bills of lading was unknown, if indeed he was, and that notice of the arrival of the cotton could not be given. Diligent inquiry for the consignee, at least, was a duty, and no inquiry was made. Want of notice is excused when a consignee is unknown, or is absent, or cannot be found after diligent search.* And if, after inquiry, the consignee or the indorsees of a bill of lading for delivery to order cannot be found, the duty of the carrier is to retain the goods until they are claimed, or to store them prudently for and on account of their owner. He may thus

---

* Fisk *v.* Newton, 1 Denio, 45; Peytona, 2 Curtis, 21.

relieve himself from a carrier's responsibility.*   He has no
right under any circumstances to deliver to a stranger.

· It is said, however, that the libellant delayed presenting
the bills of lading which hád been indorsed to him, and de-
layed making any demand for the cotton until after the 19th
of February, when the draft had fallen due, and when it had
been dishonored.   But that delay cannot justify the ship's
delivery of the cotton, on the day after its arrival, to persons
who 'had no bill of lading and no authority whatever to re-
ceive it.   Had the delay been instrumental in causing such
a wrongful delivery, had it been active interposition to mis-
lead the ship, a different case might possibly have been pre-
sented.   But at most the laches of the libellant was mere
inaction, and the wrong delivery was in no degree due to it.
The delivery was, as we have stated, made on the morning
after the ship's arrival in port, and the ship's order for de-
livery to Bennett, Van Pelt & Co. was issued before the
libellant could have known of its arrival.   We say this, not-
withstanding the testimony of James Van Pelt, which is
plainly in conflict with the proved and conceded facts of the
case.   And as the cotton was sold for cash on the 3d of
February, the very day of its delivery, the failure of the
libellant to claim it until some weeks 'afterwards, wrought
no injury or loss to the carrier, so far as it appears.   We
are, therefore, of opinion that the ship is clearly liable for
the cotton to the libellant. .

And we think that the libel was rightly filed in the name
of Billopp Seaman.   By the indorsement of the bills of lading
the legal ownership of the cotton passed to him, as well as
the right to control its delivery.   It is a matter of no im-
portance that the beneficial interest may have been in the
bank of which he was cashier.†   The holder of a legal right
may always assert it by suit, though he may be accountable
to another for what he may recover.   A judgment in his
favor may always be pleaded in bar against a suit by the

---

* Galloway v. Hughes, 1 Bailey, 553; 1 Conklin's Admiralty, 196; Fisk.
v. Newton, *supra*.

† Fairfield v. Adams, 16 Pickering, 381.

beneficial owner.　Besides, it is settled that the agent of absent owners may libel in admiralty, either in his own name or in that of his principals.*

DECREE AFFIRMED.

---

* Houseman *v.* The Schooner North Carolina, 15 Peters, 49; McKinlay *v.* Morrish, 21 Howard, 355; Lawrence *v.* Minturn, 17 Id. 100.