THE NORA.*

(*District Court, E. D. Pennsylvania.* December 8, 1882.)

1. SHIPPING—BILL OF LADING—EXCEPTION IN—NEGLIGENCE—SHORTAGE.

Where, by the negligence of the captain, an excessive delivery was made to one consignee and a shortage to another, in a libel by the latter against the vessel, the ship cannot avoid liability by a provision in the bill of lading that weight, contents, and material were unknown.

2. SAME—CHARTER-PARTY.

Where the charterer agreed to load with scrap-iron, and did load partly with scrap-steel, and the bill of lading provided that the shipment was subject to the charter-party, and weight, contents, and material were unknown, the vessel is liable to a consignee of a bill of lading for a shortage in the delivery of scrap-steel occasioned by the negligence of the captain.

3. SAME—EVIDENCE OF NEGLIGENCE.

That other consignments of scrap-steel were fully delivered, and that the captain declined the assistance of an expert for distinguishing iron from steel, and afterwards made an excessive delivery containing steel to a consignee entitled to iron, are evidence in this case of negligence in making a shortage to a consignee entitled to steel.

In Admiralty. Libel and answer.

Libel filed by Stewart & Co., indorsees of a bill of lading, against the bark Nora, to recover the value of a shortage of 26 tons of steel-scrap.

On April 6, 1880, Sanders Bros. shipped on the bark Nora, at Antwerp, to be carried to Philadelphia, a quantity of steel-scrap, weighing about 200,000 kilos, or 197 tons, and indorsed the bill of lading to libelants. The Nora also carried two other consignments of steel-scrap, of 10 and 24 tons, respectively, and also two other consignments of scrap-iron, of 20 and 267 tons, respectively. The vessel put into Waterford in distress, where she discharged the greater part of her cargo, and reloaded after repairs. After the arrival in Philadelphia, part of libelant's consignment was sent on general order to the warehouse, and after inspection there appeared to be a shortage of 40 tons of scrap-steel. The two other consignments of scrap-steel were fully delivered, but to one of the consignees entitled to scrap-iron there were delivered about 33 tons of scrap-steel, and in all an excess of 26 tons.

The libelants claimed that upon the reloading at Waterford steel and iron had been carelessly mixed, and that upon the arrival of the vessel at Philadelphia the captain had declined the assistance of an ex-

*Reported by Albert B. Guilbert, Esq., of the Philadelphia bar.

pert, offered by one of the consignees, for the purpose of distinguishing the metal while discharging.

The respondent denied any negligence in reloading the vessel, and claimed that the charterer had agreed to load with scrap-iron, and trim the same, and upon discovering that the bill of lading, providing that the shipment was subject to the charter-party, called for scrap-steel, the captain declined to sign until the words "weight and material unknown; weight, contents, and value unknown," were added; and also claimed that the libelants had failed to prove the amount of their alleged shipment, or to establish their ownership in the excess delivered to another consignee, which, in appearance, resembled iron, and had been so considered by the government inspector, the master, and the representative of the consignee, who received it.

The respondent also contended that the libelants were merely the agents for Collins & Co., the actual owners of the bill of lading and scrap, and that, therefore, no recovery could be had in the case as brought.

*Alfred Driver* and *J. Warren Coulston*, for libelants.

*Curtis Tilton* and *Henry Flanders*, for respondent.

BUTLER, D. J. Under the terms of the bill of lading, the libelants, who are indorsees, must show that the steel claimed was shipped, and that the non-delivery resulted from negligence. The quantity delivered was nearly 157 tons. That the quantity shipped was about 197 tons, is reasonably clear. This is the quantity named in the bill of lading; and although the respondent witheld his assent from this statement, the declaration thus made by the shipper, at the time of loading, is a part of the *res gestæ*, and while it may, and doubtless would, be insufficient to establish a *prima facie* case, it is nevertheless evidence, to be considered with other facts tending to prove the actual quantity. The ship contained two other consignments of steel, one of about 20 tons, and the other about 24, and two consignments of scrap-iron, one of about 20 tons, and the other about 267—the bills of lading for which were in all respects similar to that held by the libelants. The aggregate amount of the several consignments, (constituting the entire cargo,) as exhibited by the bills of lading, was therefore, of steel about 231 tons, and of iron about 287 tons. The ascertained weight of the cargo delivered by the ship, corresponds pretty closely with this quantity. While the delivery to the libelants was short from 30 to 40 tons, the delivery to another consignee (Samuels & Co.) was excessive to nearly

an equal amount; and this excess consisted of *steel*, while Samuels & Co. were entitled only to iron. It thus appears that after the other consignees had received all they were entitled to, there remained of the cargo what corresponded in kind, and pretty closely in quantity, with the balance due the libelants, according to their bill of lading and claim. That the steel delivery to Roebling's Sons on the consignment to Samuels & Co., as iron, in excess of the quantity called for in their bill of lading, was the libelant's steel, I have no doubt.

Was this mistaken delivery the result of negligence? If it was, the libel must be sustained; otherwise it must be dismissed. The circumstances under which the cargo was loaded, and the terms of the bill of lading, relieved the ship from the usual strictness of the obligation respecting ascertainment and delivery of consignments. The mixing of steel with iron, as was done, was not provided for by the charter, and necessarily tended to subject the ship to unusual labor and care in making delivery. I have no doubt, however, that officers of the ship had knowledge at the time of what was being done, and no objection appears to have been made until the captain was asked to sign the bills of lading. Although he then complained, and refused to sign until the language was qualified, he undertook, with full knowledge of the facts, to carry the cargo, and thus became responsible for the exercise of such care as the circumstances required, in ascertaining and delivering the several consignments. No fault shown in loading will relieve him from this obligation. Aside from the fact that the loading may be presumed to have been superintended by a representative of the ship, an implied agreement to exercise proper care respecting delivery, arose from the undertaking to carry, after being informed of the circumstances. In view of the fact that the cargo was handled in transit at Waterford, and the confusion of the metals consequently increased, the respondent should be held to a high degree of care. Might the mistake made have been avoided by the exercise of such care? I believe it might. The testimony shows that the consignments of 10 and 24 tons, respectively, of steel, were ascertained and delivered without difficulty; and the same is true of the 20 tons of iron, and the partial delivery of steel to the libelants. No trouble was encountered thus far in distinguishing the two kinds of metal. It is not shown that the steel delivered to Roebling's Sons, as iron, differed from the other, delivered to the libelants. The description of the former by the witnesses does not establish such difference. It seems quite clear that if the captain had not declined the aid of Mr. Alexander, who went

to the ship to assist in distinguishing Samuels & Co.'s iron, the mistake would have been avoided. The sending of this expert to superintend the separation of the metals was additional notice of the necessity for care. The captain, however, asserted entire confidence in his own ability to distinguish the iron from the steel, as also did the mate. And yet he delivered 33 tons of steel on Samuels & Co.'s consignment of iron, 26 tons of which were in excess of the entire amount of metal called for by this consignment. This fact—the delivery of such an excess without inquiry or hesitation—is pregnant with evidence of negligence. The circumstance that he was giving to this party such a quantity of metal more than he was entitled to, while the libelants' delivery was short in an equal or greater amount, should certainly have created apprehension of mistake. Investigation then would have disclosed the fact that he was delivering the libelants' steel to Roebling's Sons, as plainly as it did when subsequently made.

If it were granted that the respondent might, under the charter and bills of lading, have treated the entire cargo as *iron*, and delivered it as such, his position would not be improved. It would still be plain that he should have stopped when Samuels & Co.'s consignment was fully delivered, and placed what remained to the libelant's deficiency.

The fact that the libelants were not present at the delivery does not tend to excuse the respondent.

As indorsees of the bill of lading the libelants have title, and may sue in their own names, as they have done. *The Thames*, 14 Wall. 107, 108.

See *Pollard* v. *Vinton*, S. C. U. S. 11 FED. REP. 351, and note; *Lindsay* v. *Cusimano*, 10 FED. REP. 302; *The Bristol*, 6 FED. REP. 638; *Merrick* v. *Wheat*, 3 FED. REP. 340; *Compart* v. *The Prior*, 2 FED. REP. 819; *Willis* v. *The Austin*, Id. 412; *Richards* v. *Hansen*, 1 FED. REP. 54; *O'Rourke* v. *Tons of Coal*, Id. 619; *Hall* v. *Penn. R. Co.* Id. 226; *Muser* v. *Am. Ex. Co.* Id. 382; *Unnevehr* v. *The Hindoo*, Id. 627.