## THE SAUGERTIES.[1]

### SMITH et al. v. THE SAUGERTIES, (two cases.)

### GENTHNER v. SMITH et al.

#### (District Court, S. D. New York. November 25, 1890.)

1. CARRIERS—JOINT ADVENTURE—PROTESTED DRAFT—FORFEITURE.

Upon the shipment of a cargo of ice upon a joint adventure, under a contract providing for the acceptance by the consignee of a sight draft for a guarantied sum, to be attached to the bill of lading, under which contract the consignee chartered the vessel on which the cargo was accordingly shipped, and made advances for transportation pursuant to the contract, time not being made essential, held, that the shipper was not entitled to treat the contract and the charterer's rights as forfeited by the mere non-acceptance of the draft, or to deal with the cargo as his own.

2. SAME—BILL OF LADING—MASTER'S COPY—INDORSEMENT—PREMATURE SUIT.

Upon such a joint adventure and shipment, the bill of lading made the cargo deliverable to the order of the shippers. Held, that the bill of lading was controlled by the contract subject to which the ice was shipped; and that the master's copy, obtained at the port of delivery by the shipper to attach to the draft was insufficient, though indorsed to the libelants, to require the vessel to deliver the cargo to them, while the other bill of lading was outstanding, without indemnity to the ship against the claims of the charterer for whom the ship held possession, subject to the contract; and that a suit for the ice thereupon was prematurely brought.

3. SHIPPING—NEGLIGENCE—STEAM IN HOLD—DAMAGE—FREIGHT.

On delivery of a cargo of ice, a considerable portion proved to be "struck." There was a valve in the pipe in the hold used for the discharge of condensed steam. Beneath the valve a large hole was found on discharge running through the cargo, and considerable steam was at times observed in the hold. Held, upon conflicting evidence, that the damage was largely due to the negligent use or condition of the valve by which the ice had become "steam-struck," through steam escaping into the hold; and the amount of such damage was allowed in the second libel, and offset against the amount due under the third libel as freight for the use of the vessel.

In Admiralty. First suit to recover damages for non-delivery of cargo of ice. Second suit to recover for damage to the ice during transportation. Third suit a cross-suit to recover freight for transportation of the ice, and use of the vessel during delivery.

Goodrich, Deady & Goodrich, for Smith et al.

Wing, Shoudy & Putnam, for the Saugerties and owner.

BROWN, J. The above three libels have grown out of a shipment of a cargo of ice on board the barge Saugerties, by the Treats Fall Ice Company, of Bangor, Me., to the firm of C. L. Riker, of New York, in August, 1890. On the shipment, a bill of lading for the ice was taken by the company, making the ice deliverable to the company's own order. After the arrival of the Saugerties at New York, the captain's copy of the bill of lading was obtained by the company for the purpose of drawing on Riker on account of the cargo, and, the draft not being paid, the company delivered the captain's bill of lading, indorsed by them, to the libelants, to whom they also executed a bill of sale. The first libel was filed September 23d, to recover damages for non-delivery of the ice to the

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

libelants on demand as indorsees of the bill of lading. The second libel, filed October 21st, claims damages for negligence during the transportation of the ice, whereby it became "struck" through steam negligently admitted into the hold. The third libel was brought by the owner of the Saugerties to recover for the hire thereof at $50 per day, upon the alleged promise of the respondent to pay at that rate therefor.

The ice was shipped on board the Saugerties by the Treats Fall Ice Company, under a written contract with C. L. Riker, dated August 12, 1890, which provided, among other things, (1) that the company should ship on board the Saugerties, then on the way to Bangor, 1,600 tons of good merchantable ice; (2) that Riker should tow the barge, when loaded, with all reasonable speed to New York, and there sell the cargo for the best price obtainable; (3) that he would pay the company's draft at one day's sight for the certificated, in-take weight of the cargo, at $2.50 per ton; certificate of weight and bill of lading to be attached to the draft; the said $2.50 per ton being guarantied to be paid to the company in any event, unless the cargo were lost; from the proceeds of sale Riker, to have $1.50 per ton freight, half the cost of towing, and the cost of discharge, and to advance all necessary expenses incurred after the cargo left Bangor; the cargo to remain the property of the company until sold and paid for; and the net profits to be evenly divided between the company and Riker, who was to furnish a detailed statement of the expenses, and a check to the company for their share of the profits. Riker had chartered the barge at the rate of $50 a day, for the purpose of bringing on the cargo of ice, and also a tug to tow her to Bangor and back to New York. The barge left Bangor August 30th, and arrived near New York September 5th. On August 28th, in consequence of a fall in the market price, Riker wrote to the company requesting them not to draw on him on one day's sight with the bill of lading, but promised to pay the amount before he unloaded the cargo, to which a reply was sent by Mr. Bartlett, one of the company, that he would see him in New York in reference to it. On September 5th, Mr. Bartlett came to New York, and had several interviews during the week following with Riker and his partner without referring to the draft. On the 12th he told Riker he wanted the contract performed, and on the 13th told his partner that he had determined to draw. In the mean time, finding that he had left the bills of lading in Bangor, he procured from the captain of the barge his copy of the bill of lading, telling him that he wished to make use of it for the purpose of drawing on Riker, according to his contract, and gave the captain a receipt; promising to send him one of the other bills of lading as soon as he returned to Bangor. On the 15th, a draft at one day's sight was drawn on Riker by Mr. Bartlett in the name of the company for $4,000, attached to the master's bill of lading, which Mr. Bartlett indorsed in the name of the company, and presented for acceptance to Riker. It was duly protested for non-acceptance, and on the 19th duly protested for non-payment. On Saturday, the day following, Mr. Bartlett executed a bill of sale of the ice in the name of the firm to the libelants, and delivered to them the indorsed bill of

lading that had been attached to the draft. On the same day, the libei-ants demanded of the master and owner of the barge a delivery of the ice under the bill of lading and bill of sale above stated. In the inter-views that followed on the same day, the owner of the barge referred to the claims of Riker under his charter of the barge, and his payment of $900 on account of the charter money, and of some $800 in addition for towage; but he offered to deliver the ice as desired if the libelants would indemnify him against any claim of Riker, which the libelants refused to do. Mr. Genthner, the owner of the barge, stated he would consult counsel, and answer further. He was notified by Riker not to deliver the ice to the libelants, and would do so at his peril. On Monday, the 22d, a notice somewhat similar was served by Riker on the libelants, and notice was also given them, on behalf of Mr. Genthner, that security against Riker's claim was required, and that the captain's copy of the bill of lading was insufficient. On the 23d, the first-above libel was filed for non-delivery of the ice on the libelants' demand. On the next day, Mr. Genthner received from Mr. Bartlett, who in the mean time had returned to Bangor, another copy of the bill of lading, as promised to the captain; and no further steps having been taken in the mean time by Riker, and an offer having been made by him to waive his claim for the moneys advanced by him, if the company would release him from his guaranty, Mr. Genthner, by his attorneys, on the 24th, agreed to de-liver the ice as requested by the libelants upon the latter's promise to pay $50 a day for the barge, allowing a reasonable time thenceforth for discharge, and computing from the 30th of August, up to which date Riker had paid at that rate.

The libelants, on the 20th or 22d, had made an agreement for the sale of the ice at $3.50 per ton, deliverable at Hoboken, and had ordered the barge there. By her failure to proceed at once, upon her arrival there on the 25th, a further delay of three days arose in getting a berth; and when the discharge was commenced, ice having fallen in price, the pur-chaser, after the discharge of about 80 tons, refused to accept any more, on the alleged ground that the ice was unmerchantable in quality, in consequence of a large proportion turning out "struck." The cargo was afterwards sold by the libelants at auction, upon notice to Mr. Genthner, at 65 cents per ton. The purchaser resold it at $2 per ton, and its dis-charge was completed on the day of the close of these trials, November 11th. On the trial it appeared that the bill of sale of the ice to the libel-ants on September 20th, and the delivery of the master's copy of the bill of lading indorsed by the company, were for the benefit of the lat-ter, and for their convenience only in the transaction of any subsequent business in regard to the ice in New York, and that it was accompanied by their guaranty to the libelants to hold them harmless, and to pay them a commission for their trouble. While the nominal title to the ice, therefore, was in the libelants, their rights were no greater than those of the ice company.

1. The first libel was, in my judgment, prematurely filed, both be-cause the ice company could not cut off the rights and interests of Riker

in the cargo in that summary manner, and because they could not lawfully require the barge to deliver the ice upon the captain's copy of the bill of lading while the other copy of the bill of lading was still outstanding. The contract between the ice company and Riker did not impose upon Riker an immediate forfeiture of all his rights as a consequence of the non-payment of the sight draft. The contract was not a contract of sale of the ice to Riker. It constituted a joint adventure, which was already to a considerable extent executed on Riker's part, and in which he had expended about $1,700. For this expenditure, he had an equitable lien on the ice; and for the $900, perhaps a maritime lien also, by equitable subrogation, though this was subject to the provisions of the contract. Such expenditures by Riker were contemplated by the very nature of the contract; and, in the absence of any express provision in the contract for a forfeiture of his rights, no such forfeiture can be implied from the mere non-payment of the sight draft at the moment it was due. For the same reason the payment of the draft cannot be construed as a condition precedent to the acquisition by Riker of important interests in the cargo; since, by the nature of the case, a large expense had to be incurred by him in the execution of the contract before the bill of lading and contemplated draft could be presented. I do not think the drawing of the bill of lading to the order of the ice company was, in itself, incompatible with the nature of the contract between them and Riker, for it can be interpreted consistently with the contract. It was a proper mode of securing the company against an unconditional delivery of the ice to Riker before he had performed his guaranty by paying the draft. Still, the ice was not in the company's possession. It had been delivered by them to the barge for Riker, to be dealt with pursuant to the contract. They knew Riker had chartered the barge to bring the ice to him, and was incurring large expenses in doing so. The possession of the barge was, for most purposes, the possession of Riker, and was subject only to the restriction of the contract, and of the bill of lading given under it, which by implication required payment of the draft before the ice came under Riker's absolute control. Here the bill of lading was not an independent document. It did not give to the ice company, as consignees, as a bill of lading usually does, the lawful disposition of the ice in any way they might see fit. On the contrary, it was a mere shipping memorandum, given in execution of the company's contract with Riker, having reference to that contract, and wholly subject to it, as respects Riker's rights and interests. After the ice was laden on Riker's chartered barge, the company had no right to do anything with the ice or with the bill of lading contrary to the contract between them and Riker. 1 Pars. Shipp. & Adm. 286; *The Chadwicke*, 29 Fed. Rep. 521.

Notwithstanding the non-payment of the sight draft when due, nothing in the contract with the ice company prevented Riker's contracting to sell the ice, and delivering it to the purchaser, at the same time with the receipt of the price and his payment of the draft. That was perfectly compatible with the contract, as well as with the bill of lading.

No special time was made an essential part of the contract; and hence such a sale and delivery and payment of the draft might be made by Riker within a reasonable time, though the sight draft was not paid on the day it was due, and interest would be the legal damages to the ice company for the delay in payment of the draft. If there was unreasonable delay in disposing of the ice, the ice company could have brought the adventure to a close, on notice to Riker, by obtaining possession of the ice, if they could do so peaceably, and then selling it upon joint account; or by obtaining from the court, on suit brought, an order for an immediate sale. Such a sale would necessarily be upon joint account under the contract. A sale of the ice by the ice company to the libelants, such as this bill of sale imported, could only stand upon a lawful right in the company to repudiate the entire contract, and to treat the rights of Riker as wholly forfeited. If any such right existed, it was of so doubtful a character, and its exercise was so harsh and inequitable, that it would be most unreasonable to require the barge and her owner to take upon themselves the risk and the burden of maintaining such a right, by delivering the ice, not to the shippers even, but to third persons, in violation of the charter to Riker, under which the vessel was running. Such a delivery of the ice to other vendees, with all the advantages of its transportation to New York, which Riker had procured and paid for, would be a much more serious and doubtful proceeding than would have been a delivery to the shippers themselves, on account of non-payment of the draft. The latter might have been partially compatible with the contract. The former was a total repudiation of both the contract and the charter. The demand of security against Riker's claims, as a condition of the delivery of the ice to the libelants was, therefore, a justifiable demand; and, such security having been refused, the vessel cannot be held liable to the libelants for non-delivery on that demand, nor for any damages accruing from such non-delivery. The use of the captain's bill of lading, moreover, as a means of diverting the delivery of the ice to some other person than Riker, was not authorized, and imposed no duty on the ship. The use of it for the purpose of attaching it to the draft, to secure a performance of the contract with Riker, was perhaps permissible, because that was using it consistently with the contract, and the captain assented thereto. The use of it for the purpose of selling and delivering the ice to third persons was not justifiable, because that was not only inconsistent with the contract with Riker, but was not assented to by the master or owner of the barge. The barge was, therefore, justified in refusing to deliver the ice to any one but Riker, except upon the production of some other bill of lading than the captain's own copy. A vessel is never called on to take the risk of delivering goods upon the captain's bill of lading only, which is a mere memorandum for the ship's convenience, while another bill of lading is outstanding, which the captain of the vessel may be called on to make good by the delivery of the cargo to another, or be mulcted in damages for non-delivery. *The Thames*, 14 Wall. 98; *The Mary Bradford*, 18 Fed. Rep. 189; *The Stettin*, 14 Prob. Div. 142. This objection was not removed until the forwarding from Bangor of the additional bill of lad-

ing, which was received on September 24th, the day following the filing of the libel. As soon as the latter bill of lading was produced, and Riker apparently no longer insisted on his claims, the vessel proceeded to act under the libelant's direction, as she has done ever since. The first libel must, therefore, be dismissed.

2. As respects the second libel for the damages from steam improperly admitted to the hold, there has been a large amount of testimony, exhibiting a great difference of opinion, both as to the actual marketable quality of the ice as it came out of the vessel, the amount of "struck" ice, and the probable cause of its struck appearance. There is proof that ice may be sun-struck, water-struck, wind-struck, or fog-struck; and, upon analogy, it is argued that it might be steam-struck on board the barge, though no previous instances of that kind of striking are proved. It is shown that some struck ice went on board, though it was urged that this was extremely little. Some of the conditions while loading were favorable to ice being struck; while more or less snow on the surface of the ice would at least partly protect it from the influence of those conditions. There is evidence that at times considerable steam was observed in the hold, through the use of a drip-valve beneath the pump room by which the steam-pipe below was cleared of previous condensation whenever pumping was to be done. While some of the witnesses on this subject are not very exact or trustworthy as respects the amount of steam observed, yet I cannot help giving great weight to the existence of a large hole, of the size of a man, which was found running down through the ice immediately beneath the valve, when the hatches were opened and the discharge commenced. Though drip-valves similarly placed were proved to be not uncommon on ice barges, no hole like this in the ice beneath them, or any hole, was proved to have been found in any previous case. This is convincing proof of some defect in the valve, or of some improper use of it while pumping, whereby quantities of steam were forced down into the hold. This lends a probability and force to the other testimony about the amount of steam seen in the hold, to which, through its vagueness, it would not otherwise be entitled. Looking at the whole evidence, I come to the conclusion that a considerable portion of the ice was damaged through steam improperly let into the hold while the hatches were on; and that the amount of this damage, difficult as it is to fix, was $1,900.

3. *Use of the Barge.* The sale of the ice by the libelants was on October 14th, and 12 days were allowed by them to the purchaser to take the balance of the ice from the barge. This may be taken as their own estimate of a reasonable time for discharge after the previous discharge of 80 or 100 tons, during which they were to retain the barge for their own use. From August 30th, this makes 57 days. Deducting seven days, as a sufficient and ample time for a resale of the ice after its rejection by the first purchaser, for which the libelants should not be charged, because caused by the barge's fault, there remain 50 days, for which they are liable upon their promise, at the rate of $50 per day, making $2,500, against which should be offset the $1,900 damage to the ice adjudged in the other action, and a decree entered for the difference.