# BEASLEY v. BALTIMORE & POTOMAC RAILROAD COMPANY.

EVIDENCE; STATUTE OF LIMITATIONS; TROVER; CARRIERS; LIEN FOR FREIGHT CHARGES.

1. In an action for damages caused by the unlawful detention of the plaintiff's property shipped over the defendant's railroad, it is proper to admit evidence showing the cause of delay, and that the defendant used due diligence.

2. Where an action is brought within the period of the statute of limitations, a count added after the expiration of such period is not subject to a plea of the statute, where such count is founded on the same wrong set forth in the original counts.

3. Trover will lie for the value of property illegally withheld under an unlawful claim for freight charges, and a demand, tender, and refusal to deliver constitute prima facie evidence of a conversion.

4. Even if a railroad company may withhold from the owner goods shipped over its road, for the purpose of ascertaining whether the bill of lading correctly states the amount due or whether a waybill in its possession sets forth the true amount, yet it can hold the goods only for a reasonable time.

5. Where a carrier refuses to deliver goods to the owner until the amount due for freight is ascertained, it cannot be said, as a matter of law, that six days is so clearly a reasonable time that there is no room for submitting the question of due diligence to the jury.

6. A railroad company receiving goods from a connecting line has a lien for the freight charges, but only to the extent of the contract price as set

forth in the bill of lading; and, if it claims a lien for a larger sum, it does so at its own peril.

No. 1653.   Submitted May 3, 1906.   Decided June 5, 1906.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia in an action for the detention of property and for the negligent keeping thereof.

.                                            *Reversed.*

The COURT in the opinion stated the facts as follows:

Appellant's intestate, John W. Bradshaw, on April 4th, 1899, shipped from Tampa, Florida, to Washington, District of Columbia, two horses, one of which he owned and in the other of which he had a half interest.   These horses, with two others belonging to other parties, were delivered to the Savannah, Florida, & Western Railway Company, and that company issued a bill of lading to one P. Mulcahey as owner and shipper of all four horses, making a through rate of $130.10 over its own and connecting lines to Washington, District of Columbia.   The horses were delivered to appellee at Quantico, and by the appellee were brought into Washington, arriving about noon on April 7, 1899.

Early in the afternoon of that day Bradshaw and Mulcahey, who had traveled with the horses in accordance with the terms of the bill of lading, applied to appellee's agent for their horses, exhibiting their bill of lading and at the same time tendering him $130.10, the sum fixed in the bill as the charge for freight. The agent refused to deliver the horses, upon the ground that he had in his possession a waybill which obliged him to collect $201.60.   The agent suggested that they pay the difference between the two rates, and that if the lower rate should prove the correct one the overcharge would be refunded.   Bradshaw offered to pay one half of the difference if the agent would release his two horses, but this offer was declined.   He also requested the agent to telegraph to Tampa to ascertain the correct rate; and also offered to telegraph at his own expense if the agent would agree to accept the answer received as correct.   The agent refused to accede to either of these propositions.

That same afternoon appellee's agent had the horses taken from the car and sent to a livery stable. The agent thereafter took steps to ascertain the correct rate, with the result that on April 13, six days after the arrival of the horses, he was advised that a mistake had been made in the waybill furnished him, and, being authorized to deliver the horses on payment of the sum set out in the bill of lading, he notified Bradshaw and Mulcahey that they might have their horses upon payment of $130.10. They refused to accept this offer upon the ground that, owing to the alleged improper manner in which the horses were cared for, they had become ill, and that their value had been wholly destroyed during the period of detention. Some days later the appellee was authorized by the court to sell the horses as unclaimed freight. The sale brought sufficient to pay the freight and cost of keeping, and left a surplus of $14.70, which sum is still in the possession of the appellee. Thereupon Bradshaw brought this suit. The declaration, as filed, contained three counts: The first in trover, alleging a conversion of the horses, and claiming their value at the date of the alleged conversion; the second and third counts are in case for damages caused by the unlawful detention. In November, 1905, a further count was added, averring negligence in the care and custody of the horses and claiming damages for the results of such negligence. The general issue was pleaded to all the counts, and also the statute of limitations to the fourth. These are the essential facts, and are substantially undisputed.

At the conclusion of the evidence appellant requested the court to give four instructions to the jury, all of which were refused, and to which refusals exceptions were taken and allowed. Upon the motion of the appellee, the court instructed the jury to return a verdict for it on all of the counts in the declaration. Appellant duly excepted to such ruling.

From the judgment in favor of the appellee upon the verdict directed by the court, this appeal was taken.

*Mr. Charles A. Keigwin, Mr. Rossa F. Downing,* and *Mr. William Beasley* for the appellant.

*Mr. Frederic D. McKenney* and *Mr. John S. Flannery* for the appellee.

Mr. Justice DUELL delivered the opinion of the Court.

The assignment of errors sets forth that the court erred: First, in directing a verdict for the defendant; second, in refusing to grant the prayers offered by the plaintiff, and in not submitting the case to the jury; third, in admitting in evidence the waybill; fourth, in admitting evidence of the inquiry made by the appellee company relative to the rate, and of the fact that the company offered to deliver the horses on April 13th.

Considering these assignments in reverse order, we are of the opinion that the fourth and third are not well taken. Appellant's declaration, as we have seen, contained four counts. At least as to the counts in case and for negligence appellee had a right to show why the horses were detained, and that it was duly diligent in trying to learn the true facts and that when it learned them it offered to return the horses. We are not prepared to say that such evidence was not admissible under the trover count of the declaration.

The second and first alleged errors will be considered together. In passing, it may be said that we do not understand that the pleas that the cause of action did not accrue within three years before the filing of the amendment to the declaration is insisted upon. However that may be, we consider that it is not well founded. The injury therein complained of is the same wrong set forth in the three original counts. The cause of action remaining the same, charging it in a different form does not render the amendment open to the defense of the statute of limitations.

The evidence does not present any serious conflict as to the facts. The facts admittedly show that appellant's intestate had title to the property in question, that the appellee had possession of the horses; that appellant's intestate tendered the amount due under the contract with the initial carrier for the carriage of the horses, and that the sum tendered was far in excess of any claim that appellee had for its own services in transporting the

horses over its line; that appellee refused to surrender the horses except upon payment of a greater sum, and one which later was admitted to be an unlawful charge by appellee's offer to surrender the horses on payment of the lesser sum. It is contended by appellee that this refusal to surrender the horses was a conditional refusal, and therefore does not amount to conversion. We cannot agree with such claim, and the weight of authority certainly does not sustain the contention. Trover will lie for the value of property illegally withheld under an unlawful claim for freight charges. *Marsh* v. *Union P. R. Co.* 3 McCrary, 236, 247, 9 Fed. 873; *Adams* v. *Clark,* 9 Cush. 215, 57 Am. Dec. 41; *Richardson* v. *Rich,* 104 Mass. 156, 6 Am. Rep. 210. In the case at bar we have a demand by the owner for the horses, with a tender of the contract price for their carriage, and a refusal to deliver them, except upon payment of a sum in excess thereof. This is at least prima facie evidence of a conversion. To offset this, appellee insists that it had a right, in view of the circumstances, to detain the horses for the purpose of ascertaining whether the bill of lading correctly stated the amount due, or whether a waybill which was in its possession set forth the true amount. Admitting, without conceding, the correctness of this contention, the appellee would only be entitled to hold them for a reasonable time. *Northern Transp. Co.* v. *Sellick,* 52 Ill. 249.

As was said in that case, which is one where the carrier refused to deliver a carriage until a larger sum than the contract price was paid: "It was their duty to deliver the carriage * * * on its arrival, on his offering to pay the freight agreed upon. The refusal to do so was wrongful, and was, in itself, evidence of a conversion of the property. The demand in June, on the arrival of the carriage, gave appellants an opportunity of delivering the carriage to appellee, and thus relieving themselves from all responsibility. Refusing so to do, unless on compliance with an extortionate demand, greatly beyond the agreed compensation for carrying, threw the entire responsibility, in case of loss, upon the appellants. * * * The refusal to deliver is evidence of a conversion, and appellants have offered nothing to destroy its effect."

Another case much in point is *Evansville & C. R. Co.* v. *Marsh,* 57 Ind. 505. There the initial carrier agreed to send a horse over its own line and the connecting line of the defendant for a stated sum. The defendant's agent at the terminal point demanded a sum equal to the regular freight rates of both lines. So it was brought and recovery had. The court said at page 507: "This freight question seems to us to be within a narrow compass. If there was a connection or agreement between the two roads mentioned, by which the contract in question for through freight was authorized, then the Evansville company was bound by it, and was liable to deliver the horse on the tender of the amount of freight, $24.60, stipulated for in the contract. If there was no such connection between the companies, and the agent who made the contract at Vinton, Iowa, had no power to bind the Evansville company by that contract, then the Evansville company had a right to collect her own freight, and was not bound to collect that of the other company. She might receive the amount tendered in discharge of the freight, and, if it only equaled her own charge, she might retain the whole of it. If it exceeded that charge, she would account to the other company for the overplus. The Iowa company had agreed to ship the horse in question to Evansville for a given sum of money. That company thereby assumed the burden of satisfying the charges of the roads over which she should ship the horse, and, if it took the whole amount she charges for the entire route, she would have to pay it, if it left nothing for her own company."

The admitted testimony shows that appellee's agent declined to take any steps outside the usual leisurely custom to learn the correct amount to be collected. It took the appellee six days to learn that it was unlawfully detaining the horses. We cannot say, and we think the trial court could not say, as it virtually did by directing a verdict for appellee, that six days was so clearly a reasonable time that there was no room for submitting the question of due diligence to the jury. Appellant's fourth request that the court instruct the jury brings up this question

in the most favorable light that appellee has any right to have it presented. That request was as follows:

4th. To return a verdict for the plaintiff in a sum equal to the difference between the value of Bradshaw's horses on the 7th of April, 1899, and the value of said horses on the 13th of April, 1899, as such difference should appear from the evidence, unless the jury should find as a fact that the agent of the railroad company had reasonable cause to refuse delivery of the said horses on April 7th, 1899, and unless the jury should further find the officers and agents of the said company exercised due diligence and acted with reasonable promptness and in good faith to ascertain whether or not a mistake had been made in respect of the proper rate of freight and in causing such mistake to be corrected.

Appellant's intestate had presented the bill of lading, which was the contract with the initial carrier. There is no ambiguity about it. The waybill upon which appellee relies for its justification for a refusal to respect the bill of lading is not so clear and precise as to warrant, beyond any question, appellee's right to rely upon it in exclusion of the bill of lading. It shows upon its face that the through rate on the shipment was $130.10. Then follow those words and figures:

| Plant System Charleston to Richmond | | North of Richmond | Collect |
|---|---|---|---|
| 136.00 | 40.00 | 25.60 | 201.60 |

. The printed word "collect" is written over with some letters that may be intended for "Coll." No reason is apparent for writing over the printed word if the letters mean the same as the printed word. Furthermore it would seem as though the through rate being given, the separate rates from point to point were also given so that each carrier could figure its share of the through rates. In any event, with these two papers before him it would seem as though the question whether appellee's agent had reasonable cause for refusal to deliver the horses until he had made an investigation was one for the jury. We have no

doubt that the other question of diligence and promptness on the part of the appellee's agent was one for the jury to decide in view of all the testimony. It was error in the court below to refuse the appellant's fourth prayer, and for such refusal, if for no other, the judgment must be reversed.

We may concede that appellee had a lien upon the horses for its own freight charges and the charge of the preceding carriers, and until that lien was satisfied it had a right to hold the horses. That lien, however, was only to the extent of the contract price as shown by the bill of lading. If it claimed a lien for a larger sum it did it at its peril. Appellant's testator was not bound to submit to any different charge. He was under no legal obligation to pay the unlawful charge and take his chances of the repayment of the amount of the overcharge. To establish any such rule would result in putting every shipper of goods at the mercy of the carrier.

The contract of carriage exhibited by Bradshaw to the appellee was the evidence of the amount to be collected. It was of controlling character. "The contract between the ship and the shipper is that which is contained in the bills of lading delivered. The ship's bill was designed only for its information and convenience; not for evidence, as between the parties, of what their agreement was. If it differs from the others, they must be considered as the true and only evidence of the contract." *The Thames (The Thames* v. *Seaman)* 14 Wall. 98, 105, 20 L. ed. 804, 805.

It is the custom to collect the freight charges at the point of delivery. To what extent a bill of lading is of binding force between the carrier making the contract and the one making the collection does not appear. The relations between the connecting lines could probably have been more satisfactorily shown. However this may be, it is immaterial at this time. Nor do we see any necessity for reviewing at greater length the questions involved herein. They may be presented in a different light should the case again come before this court. For the reasons stated, the judgment must be reversed, with costs, and the case remanded to the court below for further proceedings not inconsistent with this opinion.          *Reversed.*