## THE EVA D. ROSE.

(District Court, E. D. North Carolina. February 8, 1907.)

1. SHIPPING—CONTRACT OF AFFREIGHTMENT—EVIDENCE.

In the absence of a charter party, the bills of lading delivered to the shipper are taken as the best evidence of the contract of carriage.

2. SAME—NONDELIVERY OF CARGO—LIEN.

The going aground of a vessel is not, ipso facto, negligence which gives a lien in admiralty on the vessel for nondelivery of cargo in accordance with the contract.

3. SAME—WAIVER.

Where a vessel went aground not far from a port of delivery, consignees, who received cargo where she lay, thereby waived a delivery in strict compliance with the contract.

4. SEAMEN—LIEN FOR WAGES.

Where seamen intervene with claims for wages in a suit in rem against the vessel, a court of admiralty will adjudge their rights on such intervention, regardless of the merits or disposition made of the original libel.

In Admiralty. Suit in rem for nondelivery of cargo.

D. L. Ward and A. D. Ward, for libelant.

W. D. McIver, for respondent.

PURNELL, District Judge. Under a verbal contract with Mathorn & Hooper, of Baltimore, the master of the schooner Eva D. Rose agreed to carry about half a cargo of merchandise from Baltimore and Norfolk to Vandemere and Stonewall, N. C., for $140. In entering Bay river the schooner ran aground, stuck fast. The captain went ashore and 'phoned from a country store to some of the consignees at Vandemere. Several came down the river and aboard the schooner. These consignees wanted to take their goods off on lighters and small boats. The master demanded their bills of lading, which were not produced. He then demanded receipts for such goods as were taken off his vessel. The master and consignees chaffered for some time, when it was agreed $40 should be taken from the freight money in satisfaction for the bagging jettisoned, and the balance of the freight was paid. The master continually and repeatedly asked for the bills of lading, which were not produced. Respondent would have had no right to deliver the cargo to a stranger, and took great risk in delivering to any one except the consignee. The Thames, 14 Wall. 98, 20 L. Ed. 804. Threats of libel were made, and under the circumstances the master of the vessel became confused, when it appeared to him advantage was being taken of him, a stranger, in strange waters, trying to do what he conceived to be right. Being unable to make any satisfactory settlement or concession, when the cargo was mostly discharged as before stated and his vessel floated, he put to sea, saying he would take the remaining part of the cargo back to the consignors in Baltimore, and was going outside because of a threat and fear his ship would be libeled if he attempted to return the way he came, through the canals. Claimants commenced claim and delivery proceedings in the state court, and then secured a libel in rem, engaged the Revenue Cutter Boutwell, and overhauled the schooner at Ocracoke Inlet, where she had again gone aground, and took her back to New Bern, N. C. This is a laconic but fair statement of facts which are proved from the record and the depositions taken by consent. The commissioner was not directed or authorized to find the facts, though that is the usual practice, because the proctors, at whose instance the reference was made, objected and only asked for an order to take and report the testimony. Questions of fact were discussed at the hearing which do not seem to be germane or important. The testimony is voluminous, and, as briefed by counsel, covers 24 closely typewritten pages. Pending the case, seamen intervened for unpaid wages. Three in number, E. C. Warren, master, and bailee of the schooner Eva D. Rose, answered admitting some of the allegations of the libel, and denying others, such as the negligence charged in getting aground.

There was no charter party, but the affreightment contract was paid. In the absence of a charter party, the bill of lading delivered to the shipper is taken as the best evidence of the contract, or as a substitute for a regularly drawn charter party. The Thames, 14 Wall. 98, 20 L. Ed. 804.

Going aground is not, ipso facto, negligence, which, under any statute or rule in admiralty cited or found, gives to parties having freight aboard a lien on a vessel. There is no claim for salvage, and was none. The vessel was never in extremis, or even danger of

151 F.—45

wreck, and no claim of this nature was set out or made. The libel is in rem. Liens in admiralty are stricti juris. But the Supreme Court seems, in the case cited above, in re The Thames, to have allowed a libel in rem for damage to cargo, or wrongful delivery to a party not named in the bill of lading, but claiming as assignee thereof. But much of the cargo was delivered at Mawl Point when the vessel was aground, received by consignees, and this must be taken as a waiver of a strict compliance with the contract to deliver at Vandemere or Stonewall. Libelants had an appropriate remedy, claim and delivery of personal property, in the state courts. The goods were within the jurisdiction of the state courts, and, according to papers sent up in the record, such proceedings were actually commenced, but abandoned, and the aid of this court in admiralty invoked by a libel in rem.

The state law gives no lien on the vessel under the state of facts as they exist in this case, and the court has been cited to no United States statute, but the claim is based on a failure to comply with the charter party or affreightment contract. The seamen intervened for their wages, and, under admiralty rule 13, they can maintain a libel in rem against the ship, and the master of the vessel sets up a claim for demurrage. Under the strict rules of pleading in civil courts these, intervening petitions would depend on the libel; but seamen being special wards of the admiralty, and the court being more liberal in dealing especially with seamen, its rules of pleading are to be liberally construed, and, in dealing with sailor's rights, will retain their interpleader, if it has merit, and adjudge their rights as upon an original libel. Their claims are not disputed, hence a decree will be entered allowing their claims for wages, as filed, and their cost. The claims for seamen's wages are the highest rank of maritime liens, adhering to the last plank of a ship, ranking all other contract claims of the same relative duties. The Virgo (D. C.) 46 Fed. 294.

The vessel was not a common carrier, but strictly a bailee. There was no written charter party, and the bills of lading, which might be taken as a substitute for a charter party, are on different blanks, some of the Baltimore Steam Packet Company, and some of the Atlantic Coast Line Railroad Company, necessarily containing in the fine print provisions applicable to either and from which no definite contract can be evolved. The master was entering waters with which he was not familiar, and claims to have been steering according to the United States sailing rules. It is in evidence that Bay river at this point is about two miles wide, with an abundance of water for a schooner of the draft of the Eva D. Rose; that a buoy or beacon had been recently changed at or near Mawl Point, where the Rose grounded, which had not been noted in the sailing rules. For this the court is furnished no evidence, except such as appears in the testimony of the witnesses. The latest sailing rules, which the master claims to have been following, are not produced. In re The Chattahoochee, 173 U. S. 550, 19 Sup. Ct. 495 (43 L. Ed. 801), the Supreme Court says, speaking through Mr. Justice Brown, considering the question of changes:

"But libelants insist in this connection that the act of February, 1893, known as the 'Harter Act,' has modified the previous existing relations between the vessel and her cargo, and has an important bearing upon this branch of the

case. By the third section of that act, the owner of a seaworthy vessel (and in the absence of proof to the contrary, a vessel will be presumed to be seaworthy) is no longer responsible to the cargo for damage or loss resulting from errors in navigation."

Since the hearing, a paper writing has been filed, a kind of stipulation, an agreement, or receipt for goods aboard the vessel, releasing the marshal. This paper writing, whatever it may be called, is signed and sealed by six of the consignees and the master, and seems to be an abandonment of all claims, except for cost and some goods claimed to be short, which shortage the master denies. Since the filing of this paper, the case presented is more than ever confused and rendered more difficult to ascertain the contentions or rights of the parties. The receipt of goods at Mawl Point, and receipt in full for such goods, was a waiver of the obligation on the part of the consignee of such goods to have the voyage completed to Vandemere and the goods delivered there. The agreement as to the bagging jettisoned and the reduction of the freight merely seems to have been a satisfaction of all claims on this score, and at the time was so intended. It must be taken and given the effect intended at the time the agreement was made and entered into; there being no allegation sufficient to avoid this purpose of the action of the parties. The only claims then remaining under the original libel are as to that part of the cargo left on the vessel (there is nothing there now), the shortage on the bills of lading, of which there is no definite satisfactory proof, and the claims for seamen's wages. The latter must be allowed. The others are disallowed for want of satisfactory proof.

It is therefore ordered, adjudged, and decreed that the libel herein be dismissed, and each party pay his own cost, except as to the intervening libels of the three seamen, which are allowed with their costs, to be paid by respondent and the vessel, or the proceeds of a sale thereof. The claim for demurrage is disallowed.