Lord, Day & Lord, New York City, John T. Noonan, New York City, of counsel, for respondents.

**H. W. ST. JOHN & COMPANY, Inc., and The Midvale Company, Libelants,**

v.

**THE FLYING SPRAY, her engines, boilers, tackle, etc., and Isbrandtsen Company, Inc., Respondents.**

United States District Court
S. D. New York.

Nov. 9, 1956.

RYAN, District Judge.

This suit in admiralty has been filed by the libelant, a Delaware corporation, the present corporate name of which is General Industrial Enterprises, Incorporated, to recover the value of 41,916 pounds of pig iron, the weight shortage of a cargo shipment which it alleges was shortlanded at Philadelphia on December 16, 1951, from The Flying Spray, a cargo carrier vessel owned and operated by respondent, Isbrandtsen Company, Inc., after carriage from Rotterdam aboard that vessel.

The ownership and operation of The Flying Spray by the respondent is admitted. Jurisdiction of the person of the respondent and of the subject matter is not

questioned. I conclude that the Court has such jurisdiction, and I make the following findings of fact:

The vessel Flying Spray put into the Port of Rotterdam on November 17, 1951; on November 23 and 24, 1951, it took on a bulk cargo of pig iron for carriage to Philadelphia; the delivery aboard was made by shore cranes lifting from a river barge. There was no weighing in at the time of the loading. The ship accepted the prior carrier's or shipper's weight. The respondent's agent issued an onboard bill of lading for the shipment dated November 24, 1951, with the description of goods reading "One cargo of German basic pig iron" and representing the gross weight kilos, as "said to weigh, 1524.819 kilos."

The terms of the bill of lading provide that it shall be "Subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936 [46 U.S.C.A. § 1300 et seq.]"

The ocean freight calculated upon a shipment of the weight of 1524.819 kilograms was prepaid at Rotterdam. The pig iron was shipped in the form of molded ingots each weighing about 90 pounds, and about 12 or 13 inches in length, 6 inches wide, and 2 inches thick. This was the only shipment of pig iron aboard the vessel on this voyage.

I have computed the 1524.819 kilograms recorded on the Bill of Lading at 2.2046 pounds to the kilogram, and have transmuted this amount to 3,361,615.8 pounds, or 1500.721 tons.

The libelant is the owner and holder in due course for value of the bill of lading and cargo in suit.

The bill of lading is prima facie evidence of a delivery to the respondents of 1524.819 kilograms of pig iron. The libelant has the burden of establishing that the cargo was shortlanded at the Port of Philadelphia, Pier B, on December 16, 1951.

All of the cargo aboard the vessel was discharged at Philadelphia between December 18 and 31, 1951, with the ship's gear by loading into 27 gondola type freight cars of the Reading Railway; nine of the cars were found to be overloaded, and these cars were taken to another pier, the excess loads taken off and placed into another freight car of the same type.

The libelant has sought to establish short weight on delivery by proof tending to show the weight of the 28 freight cars when empty and the weight of the same freight cars after the loading with pig iron, and by subtracting the tare weight to arrive at the net weight of the load, thus establishing the alleged short weighted delivery.

To establish this libelant propounded interrogatories, and respondent, at the same time, propounded cross-interrogatories to one Harry J. Dougherty, an import clerk, who has been in the employ of the Reading Railroad for 19 years. It was his duty in December, 1951, to take care of the forwarding of cargo which was imported on vessels, weighing the freight cars, and making out bills. He "light weighed" two of the freight cars used on this transshipment from The Flying Spray. He testified that under the practice of the railroad the cars were light weighed before being loaded and weighed again after loading to determine the heavy weight, these weights recorded and railroad scale tickets made out, each bearing a consecutive number, being a certificate of weight, showing date, number of freight car, commodity loaded, gross weight in pounds, tare and net weight. He described in detail the manner in which this weighing is done. He testified that the engine couples up to empty cars, backs down the scale track to a point where the hind car rests on the scale; the hind car is uncoupled and weighed; the engine then backs it off the scale and puts the next car on the scale, and thus continues. The same procedure, he testified, is followed to determine both the light weight and the heavy or loaded weight of the cars. He testified, however, that if a car is more than 50 feet, the car is weighed in what he described as "in halves," the first "half" of the car

is weighed; the car is pushed over until the second "half" is on the scale, and then the second "half" is weighed. There are, however, he testified, some scales which can take a 52-foot car, but the short length of the scales at Port Richmond where the weighing of the shipment in suit was done, necessitated this double weighing of a car longer than 50 feet. This witness also testified that although his name appears on all of the weight certificates, that was only "to stop confusion on the different amount of weighers" because sometimes the cars are weighed by five or six different people. He testified that he had only light weighed two of the cars. This witness also testified that there is a stenciled weight on the freight car, which is the weight when the car is manufactured; he could not say what the stenciled weight of the freight cars used on this shipment was.

Libelant also propounded interrogatories and respondent, cross-interrogatories, to Clarence Konzelman, a clerk in the employ of the Reading Railroad Company; he did add to Dougherty's testimony that he took care of the removal of the excess loading of nine of the original cars employed on the shipment, and weighed these 10 cars, and that the cars under 50 feet were weighed with one end of the car coupled and one end uncoupled.

Libelant also propounded interrogatories and respondent, cross-interrogatories to John M. Kramlich, who was the conductor in charge of the shifting and weighing of the cars; he was the sworn weigher on the job. He testified that the cargo came in at Pier B but the cars were weighed at Pier C scale, a 50-foot scale; that some of the freight cars used were 42 feet, others 48 feet, and some were 52 feet and had to be weighed double; that he worked with Dougherty on the weighing; that when he weighed some of the cars empty, the weight exceeded the stenciled weight. This difference he said was due to the fact that the car was "dirty"; he picked out a weight ticket to illustrate this and it showed

stenciled weight 46,200, actual weight 47,100.

When considering this evidence of the alleged short weight delivery from the ship, it must be examined in the light of the precise nature of the libelant's claim. The libelant does not dispute that of a total shipment represented by the bill of lading of 3,361,615.8 pounds, all but 41,916 pounds were delivered to it; expressed in other terms, libelant admits it received 3,319,700 pounds of the pig iron shipment.

An analysis of the depositions of the three railroad employees who took part in the handling of the shipment reveals that the stenciled weights of the cars was far less than the empty or recorded tare weight. There are instances where the recorded tare weight exceeded the stenciled weight of the specific cars by 10,760 pounds, 9,700 pounds, 6,520 pounds, 6,440 pounds, and 6,360 pounds. In one case where the tare weight exceeded the stenciled weight by 900 pounds, the witness Kramlich characterized the "difference between the actual weight and the stenciled light weight" as "a big difference."

He attributed the difference to the fact that the car was "dirty." It is difficult to conceive of a freight car operating with about 1/2 ton of dirt on it before taking on the freight; certainly, it did not run as high as 5 tons of dirt. The total excess of the recorded light weight over the stenciled weight was 82,500 pounds, or almost twice the claimed amount of short delivery!

The two scales used were each 50 feet long. At least six if not seven of the gondola freight cars were 52 feet long and both the light weight and the heavy weight of these cars was determined by running the 52-foot cars over the scale twice, weighing one end and then the other, and adding the two weights. This is a new method of determining weight and contrary to the very elementary scientific knowledge of which even the Court must take notice. It is just plain nonsense to contend that

weight could be thus ascertained. How it was determined exactly when one half of the car was on the scale, we have not been advised.

One of the overloaded cars was 52 feet, which means that it was first weighed light, then heavy in its overloaded condition, then weighed again when the excess was removed and this was accomplished by the uncertain method of weighing the ends in each instance.

The other eight of the nine overloaded cars were weighed, after the excess had been removed, with the respective cars coupled at one end with the next one to be weighed. The scale must have been depressed to some extent by the loaded car; the car to which it was coupled must have been on a slightly higher elevation, and the coupling, to a degree, bore some of the weight of the car on the scale. How much force in pounds was thus exerted we do not know, but we are not dealing with peanuts.

The inaccuracies present in the weighing of cars coupled to other cars, and of weighing 52-foot cars on 50-foot scales are manifest.

It is recognized that the stenciled weights on the freight cars are intended to represent the gross weight of the car itself at the time of factory production outturn and that thereafter there may have been alterations or additions to the car which would increase or decrease its light weight. We have no evidence of whether such changes in fact had been made, and, if so, to what extent the light weight of the car had been affected. However, consideration of the recorded difference between the stenciled weight and light weight has been given only in connection with evaluating the possible effect the attempted weighing of the 52-foot cars on a 50-foot scale might have had in computing the weight of the load which was later placed in the cars.

The testimony of the railroad employees shows that the excess removed from the nine overloaded cars was 172,520 pounds; this excess was loaded in a twenty-eighth car. The recorded weight of the pig iron loaded in the twenty-eighth car was 150,860 pounds, not 172,520, and the difference is more than half of the libelants' claimed shortage.

I find no support for libelants' claim in the ship's out-run report on this cargo which records an outturn and landing similar to the arbitrary weights arrived at by the railroad employees. The cargo was not weighed at the time it was landed; the weighing did not occur till after it had been placed into the gondola cars, and then only on the railroad scale and in the manner in which we have found. The figures as to the weight of the load on the ship's out-run report were taken by the ship's stevedoring chief checker from the railroad employees' subsequent report to him and manifestly, and of necessity, are just as inaccurate and as unreliable.

█ There is an entire absence of proof to sustain the claim of shortage in delivery.

The respondent has placed in evidence a report of the Weather Bureau of the United States Department of Commerce which shows that on December 14, 1951, snow fell at Philadelphia beginning at 1:25 p. m.; that the snow had accumulated rapidly during the afternoon with 5 inches on the ground by 7:15 p. m.; that at 7:20 p. m. it changed to rain and sleet; that at 9:40 p. m. rain began and continued beyond midnight. This report also records that the temperature rose to 41 degrees at 11:59 p. m. and that the lowest temperature was 21 degrees at 4:30 a. m.

By the demonstrative exhibit, respondent's Exhibit A, it appears that the light weighing of some of the freight cars was done on December 15, 1951; whether the high temperature of 41 degrees reached at 11:59 p. m. of the previous day melted all of the 5 inches of snow which fell we are not informed. If it did not, I must observe that we have no evidence that snow fell into the gondola cars used, that they were then in the storm area, or that it does not account, at least in part, for the difference between the stenciled weight of the cars and the light

weight as recorded. In any event, I have not given weight to this snowfall in reaching my findings.

I have concluded that it is unnecessary to consider whether the respondent's evidence is sufficient to overcome the statutory presumption that the bill of lading correctly represented the weight of the cargo received on board at Rotterdam, or to rule whether respondent, not having itself weighed the cargo at Rotterdam, is now precluded from disputing the weight as stated in the bill of lading.

The libel is dismissed upon the merits, with costs to the respondents. A decree may be submitted accordingly.