**DAL INTERNATIONAL TRADING COMPANY, Libelant,**

v.

**THE SS MILTON J. FOREMAN, her engines, etc., and United States of America, Respondents.**

**No. 18994.**

United States District Court
E. D. New York.
March 13, 1959.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for libelant George B. Warburton, James M. Hastie, New York City, of counsel).

Cornelius W. Wickersham, Jr., U. S. Atty., E. D. New York, Brooklyn, N. Y., by Hill, Betts & Nash, New York City, Special Counsel, for respondents (James E. Freehill, Robert M. Donohue, Francis P. Kelly, New York City, of counsel).

MOORE, Circuit Judge (sitting by designation).

Dal International Trading Company (referred to as "Dal") brought this libel pursuant to the Suits in Admiralty Act (46 U.S.C.A. § 742) against SS Milton J. Foreman (referred to as "Foreman") and its owner United States of America both *in rem* and *in personam* for damages sustained because of shortage in, and damage to, a bulk cargo of copra in the foreman from five Philippine ports to Gdynia, Poland. Jurisdiction is conceded.

Dal was a Polish corporation with its principal office in Warsaw, Poland. In 1947, desirous of purchasing a large quantity of copra (dried coconut) for the purpose of obtaining edible oils, Dal arranged with Louis Dreyfus & Co. (Overseas) Ltd. to purchase 7,500 tons (5% more or less at seller's option) from Dreyfus Overseas in Manila. The agreement described the "Buyers" as "Messrs. Dal International Trading Company, Warsaw" and the "Sellers" as "Messrs. Louis Dreyfus & Co. (Overseas) Ltd., Manila, trough [sic] Messrs. Louis Dreyfus & Co. Ltd., London". The purchase contract was dated September 13, 1947 and was signed by Produce & Oilcakes, Limited as agents. The buyer, Dal, was to supply the tonnage and the vessel was to make stops at up to seven Philippine ports at the seller's option. The contract further provided as to quantity and condition "All final at loading port for quality, condition, weight and analysis as per Official Certificate." Payment was to be made against shipping documents in New York and an irrevocable credit "for the maximum value of this purchase" was to be opened with a New York bank in favor of "Messrs. Louis Dreyfus & Co. (Overseas) Ltd."

Dreyfus London, acting under authority of Produce & Oilcakes, Limited on behalf of Dal, then entered into a bare boat charter party dated October 11, 1947 for the Foreman, the charter being between Sword Line, Inc. as owners and Dal as charterers. Attached to the charter were additional typewritten clauses including a USA clause paramount which incorporated the Carriage Of Goods by Sea Act (referred to as "COGSA") of the United States as approved April 16, 1936 and provided amongst other things that if any term of the bill of lading be repugnant to the Act to any extent such term should be void to that extent, but not further. Paragraph 28 of the charter stated that the master of the Foreman was to make application to "Sesostris Manila" for orders as to the first loading port, subsequent orders to be given at successive ports. Sesostris Manila was

the cable code name for Dreyfus Overseas Manila. Under the charter the "Steamer" was to load "a full and complete cargo of Copra in bulk and/or bags; which the said Merchants [Dal] bind themselves to ship, * * *." Clause 21 provided that "Steamer and Owners to be held answerable for the number of packages signed for in Bills of Lading." Freight was to be prepaid in New York fifteen days after telegraphic advice of signing final bill of lading.

The Foreman, having received instructions, proceeded to the port of Cebu in the Philippines and commenced to load the copra. It then loaded additional copra at the ports of Calapan, Gasan, Siain and Legaspi. Except for Cebu the loading facilities were quite primitive, the ports being more or less jungle towns. In some cases the Foreman had to anchor off shore while the loading was done by lighters. At Legaspi planks from a bamboo dock to the stern of the Foreman provided the means of access. There was no proof as to any weighing on the docks or on the ship.

The loading took place between approximately November 2, 1947 and December 2, 1947. While at Legaspi it was noticed that there was a substantial amount of additional cargo space yet unfilled. At the request of Dreyfus Overseas, a surveyor, Lawrence Fox, together with the master, measured the available space which Fox computed to be about 50,000 cubic feet. Fox was unable to account for the unusually low stowage factor unless the amount supposedly loaded had not actually been loaded. However, no additional copra was put aboard by the shipper and the Foreman sailed for its ultimate destination, Gdynia, Poland.

When the cargo was loaded at the various ports, receipts, which the first mate described as mate's receipts, and which bore a typewritten figure already inserted indicating the weight, were submitted by the supplier loading the copra. These receipts were not produced on the trial apparently having been lost with the passage of years. The charter provided (clause 17) "The Master to sign Bills of Lading as presented without prejudice to the Charter Party,". Eight bills of lading were produced signed (with the exception of the first, which bears another signature) by "L. Alday"? for Everett Steamship Corporation, agents for owners. They state the port of loading, the name of the consignee, Dal, and the shipper. Except for the first bill of lading which reads "Aboitiz & Company, Inc.—Account Louis Dreyfus & Co. (Overseas) Ltd., New York", the shipper was either the National Coconut Corporation or an individual or company having a Chinese name. All bills of lading (with the exception of the first) in the column referring to quantity contained the words "Said To Be" stamped in a prominent place over the tonnage figure. A similar stamp reading "Shipper's Weight" was placed in the column headed "Shippers Gross Weight". The bills of lading, with the exception of the first, in which the words were similar in substance, bore the typewritten inscription "Freight And All Other Terms, Conditions And Exceptions As Per Charter Party Signed In London Dated October 11, 1947". The bills themselves in bold type contained the clause "If The Goods Are Shipped Under Charter Party, All The Terms, Provisions, Exceptions And Clauses Contained In Charter Party Dated London, October 11, 1947 pursuant to which this shipment has been made are to be deemed incorporated herein, without prejudice, however, to the right of the carrier to avail itself of all exemptions from, or limitations upon, liability, or other rights and immunities provided for in this bill of lading." The bills, again with the exception of the first, all bore a stamp reading "Shipment Covered By This Bill Of Lading Has Been Loaded On The Above Named Vessel." This inscription was also apparently signed by the same L. Alday.

After the vessel had departed from Legaspi, a cable reported a cargo weight of 5,836 tons against cargo loaded by receipts of 6,561 tons. (Actually the eight bills disclose a total of 6,600 tons.) This information was sent to Dreyfus

Overseas which forwarded it to Sword Line. Although the Foreman made several stops for fuel and repairs, the cargo was not disturbed. When the vessel arrived at Gdynia draft measurements were also taken which indicated a cargo weight there of 5,663 tons. Libelant's weighers found that 5,725 tons had been unloaded at Gdynia. The parties concede that a shipment of copra during such a voyage would lose approximately 2% or 3% in weight which would be normal shrinkage. Giving allowance to this factor the cargo discharged at Gdynia was some 700 tons less than that "Said To Be" put aboard in the bills of lading and the actual weight upon arrival was approximately 700 tons less than the represented shipper's weight at the time of loading.

In the meantime, although Dreyfus Overseas had notice of the short shipment, on December 19, 1947 a bill entitled "Full Cargo Copra Philippine Islands to Gdynia, as per Charter Party dated in London October 11th, 1947" stated to be 6,600 tons at $27.50 per ton less 2½% was paid in the total amount of $176,962.-50 and receipt acknowledged by Dreyfus Overseas. The purchase contract called for payment against shipping documents and the quality, condition and analysis was to be shown "as per Official Certificate". Libelant introduced into evidence documents entitled "Certificate of Weight and Quality of Copra Loaded Aboard SS 'Milton J. Foreman' on [various dates and ports]" and also certificates of laboratory analysis of samples of copra. The certificates are on printed forms of "General Superintendence Company Ltd." and are signed in the name of Luzon Brokerage Company, Inc., agents for Philippines. These certificates were signed by Arthur H. Barrett, vice-president. Because of his death the manner of preparing the certificates was described by Pedro R. Francisco, an employee of Luzon. The certificates dated and sworn to in Manila subsequent to the dates of loading in the five ports give the same figures as to quantity as appear in the eight bills of lading. From the Francisco deposition it is disclosed that "These certificates are issued to the firm which gave us the Superintendence order * * *" and he states that "They were based on the reports submitted by our surveyors who have been assigned to these shipments." These certificates were not issued or obtained by respondents and do not constitute any admission of receipt of cargo by them. The figures presented by the shippers which were incorporated into the bills of lading were the identical figures which found their way into the General Superintendence Company's certificates of weight and analysis. The certificates themselves bear a limiting "hedge" clause, reading:

"This Is To Certify that the above inspection, weighing, sampling and loading have been carried out to the best of our knowledge and ability but without any responsibility to the General Superintendence Co., Ltd. or ourselves as their Agents."

These were not certificates of the respondents or respondents' agents. The issuing company was selected pursuant to, and the certificates were obtained to satisfy the terms of, the purchase contract. Any payment made in reliance on these certificates cannot be attributed to any false representations by respondents.

At the close of the trial libelant's claim for cargo damage was withdrawn and it was agreed that all the cargo less normal shrinkage received on board in the Philippines was delivered in Gdynia. The case thus resolves itself into the proper application of principles of law to the material facts. There is no question but that libelant received some 700 tons of copra less than the quantity for which it paid. Whether this damage resulted from fraud or mistake is irrelevant. The fact remains that libelant lost a substantial amount of money as a result of the shortage. The main question is, who in law and equity should be responsible? It is quite apparent that approximately 700 tons of copra less than represented was put on board by the sellers. Dal made the purchase from Dreyfus Overseas. Dal also authorized Dreyfus Overseas to

act for it with respect to the loading. If Dreyfus Overseas failed to act properly as agent possibly it or the various shippers who furnished the copra should be responsible for the shortage. Such conjecture, however, is academic because libelant has chosen to sue only the Foreman and its owner. Inquiry, therefore, is limited to searching the record for evidence of responsibility assumed in fact by, or imposed by law upon, respondents.

The lines of argument of the opposing parties are clearly drawn. Libelant asserts that the bills of lading incorporate COGSA and that the bills must be deemed to have been issued thereunder. Section 3 of the Act provides (Apr. 16, 1936, ch. 229, § 3, 49 Stat. 1208; 46 U.S.C.A. § 1303):

> "Responsibilities and liabilities of carrier and ship—
>
> *    *    *    *    *    *
>
> "Contents of bill.
>
> "(3) After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things—
>
> *    *    *    *    *    *
>
> "(b) Either the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper.
>
> "(c) The apparent order and condition of the goods: *Provided,* That no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.
>
> "Bill as prima facie evidence.
>
> "(4) Such a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described in accordance with paragraphs (3)(a), (b), and (c), of this section: *Provided,* That nothing in

this chapter shall be construed as repealing or limiting the application of any part of sections 81–124 of Title 49."

Respondents argue (1) that the charter of the entire vessel by Dal for its copra shipments resulted in a contract of private rather than public carriage, making the bills only receipts and (2) that, even if the Act applies, by its terms the bills are only prima facie evidence of receipt by the carrier of the goods therein described.

The key words of COGSA, section 3(4) are: "a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods". "Prima facie evidence" is evidence which, if unrebutted or unexplained, is sufficient to establish the fact to which it is related. It proves the fact until other proof contradicts or overcomes the factual hypothesis initially set up by the presumption. In legal intendment "prima facie" is the antithesis of "irrebuttable". Hence, if other facts disprove the prima facie evidence the original fact assumption no longer exists.

Accepting for the moment the eight bills of lading as unqualified representations of weight on board, had libelant introduced the bills and both sides had rested without other proof libelant would have prevailed. But this did not happen. At the end of the trial the proof was clear that all the cargo actually received was delivered less normal shrinkage. In fact counsel for libelant and respondents so agreed. From this fact foundation the precise number of tons loaded can be quite accurately calculated. Using 5,725 tons as the weight outturned at Gdynia and 3% as the shrinkage factor the weight put on board in the Philippines had to be approximately 5,902 tons. Thus there were loaded some 700 tons less than stated on the bills of lading. Because of these undisputed facts, although the representations in the bills were inaccurate, there can be no dispute as to the actual weight received.

Respondents stress the qualifying language on the bills such as "shipper's weight" and "Said To Be". They point

to paragraph 10 of the bills which states, in part, that "the Carrier shall not be concluded as to the correctness * * * quantity, weight * * * measurement, nature, quality or value." Even disregarding these words, the bills under the Act do not achieve an irrebuttable status. A bill with an unqualified weight figure would still be only "prima facie evidence".

Libelant has cited no decisions holding that a statement of weight in a bill of lading creates an irrebuttable presumption of receipt or imposes an absolute liability on the carrier to deliver the quantity of goods thereon stated if the proof shows that the stated weight was not in fact received.

In George F. Pettinos, Inc. v. American Export Lines, Inc., D.C.E.D.Pa.1946, 68 F.Supp. 759, 764, affirmed 3 Cir., 1947, 159 F.2d 247, the question was whether the words in the bill "Particulars Declared by Shipper" deprived the bill of its role as prima facie evidence. The court held that they did not but that the libelant had not proved any shortage. Nothing in the opinion indicates that the weights listed constituted irrebuttable proof.

In George F. Pettinos, Inc. v. Thos. & Jno. Brocklebank, Limited, D.C.E.D.Pa. 1944, 65 F.Supp. 102, 104, a typewritten statement of the weight received was held to be controlling as against a printed statement on the bill "weight, content and value unknown".

In H. W. St. John & Company v. The Flying Spray, D.C.S.D.N.Y.1956, 149 F.Supp. 737, the court found an absence of proof to sustain the claim of shortage on delivery and hence it was unnecessary to consider whether the respondents' evidence overcame the statutory presumption.

Libelant relies heavily on Spanish-American Skin Company v. The M. S. Ferngulf, D.C.S.D.N.Y.1956, 143 F.Supp. 345. There the carrier failed to outturn a shipment of the weight set forth in the bill of lading. In the bill were the words "Shipper's Weight" and it was stamped with "Steamer not responsible for weight, quality or condition of contents." The principal issue was whether a carrier was liable for failure to deliver the represented weight in spite of these qualifying words. The court considered at length the effect of COGSA, section 3 and held (page 349) that "Having accepted the goods, the carrier may not avoid the prima facie effect of the bill of lading merely by entering weight and quantity as 'Particulars Declared by Shipper'" (citing Pettinos v. American Export, supra). At no place in the opinion, however, did the court say that the statements in the bill were more than "prima facie evidence of the goods as therein described". In deciding in favor of the libelant the court noted that the carrier had not "offered any proof that it did not receive a cargo of the weight described in the bill of lading". On the affirmance by the Court of Appeals, 2 Cir., 1957, 242 F.2d 551, 554, the court said that the lower court's "holding that the prima facie evidence of weight received had not be rebutted is clearly not erroneous."

These decisions cannot be interpreted as construing the Act so as to ascribe to the words "prima facie" a meaning of "irrebuttable". Despite the weights stated in the bills of lading the facts as developed during the trial make it clear that cargo in these amounts was not delivered to the carrier. Since all cargo put on board less normal shrinkage was outturned in Gdynia and this weight has been most accurately established, the presumption arising from the bills of lading cannot be accepted as creating the actual fact situation as to weight. Accordingly, judgment must be in favor of respondents with costs.

The foregoing shall constitute the findings of fact and conclusions of law required to be made by Admiralty Rule 46½, 28 U.S.C.A.