INTERNATIO, INC.

v.

**M/V YINKA FOLAWIYO, her engines, machinery, tackle, apparel, etc.**

**and**

**Maritime Associates (International), Ltd.**

**and**

**Nigerian Green Line Ltd.**

**Civ. A. No. 77–2727.**

United States District Court,
E. D. Pennsylvania.

Dec. 4, 1979.

Eugene J. Maginnis, Jr., Hecker & Maginnis, Philadelphia, Pa., for plaintiff.

Robert K. Wood, Krusen Evans & Byrne, Philadelphia, Pa., for defendants.

## OPINION

EDWARD R. BECKER, District Judge.

### I. Preliminary Statement

This suit on a contract of carriage alleging a short delivery raises interesting questions with possible ramifications for the conduct of the cocoa trade between foreign and American ports. The cocoa trade involves the shipment of raw cocoa beans packed in jute or burlap bags transported pursuant to ocean bills of lading issued by the carrier. The problem in this case arises out of an anomaly of the cocoa trade: because cocoa beans may gain or lose weight during ocean carriage because of variation in their moisture content resulting from changing humidity, trade custom provides that contracts for raw cocoa beans can be satisfied by the seller by the delivery of any amount within 1½% of the stated weight of the contract. Under the facts adduced at a bench trial, the buyer, plaintiff in this action, had ordered a total of 3,000 net metric tons of cocoa beans. Although approximately 3,026 net metric tons were delivered to the plaintiff in Philadelphia, plaintiff argues that it was entitled to receive approximately 3,033 net metric tons, the amount loaded on board the defendant's vessel by the seller in pursuance of the contract, and an amount still well within the 1½% tolerance of the contract.

The defendant carrier rails against this result, outraged at the suggestion that the quantity terms of a bill of lading might not necessarily mean what they say. Urging the sanctity of the bill of lading, defendants stress that plaintiff received more than the amount specified on the bill of lading. They also express concern over the downstream purchaser in good faith of the negotiable bill of lading, making in terrorem predictions regarding the effect the proposed result would have on the orderly conduct of the cocoa trade.[1] Furthermore, defendants point out that some cocoa bags always break in carriage, and thus invoke the inherent vice and defective packaging exceptions in the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1304(2)(m) & (n).

Plaintiff rejoins that it is not bound by the recitals in the bill of lading, that it has presented a prima facie case showing that the seller delivered more cocoa to the carrier than plaintiff received, and that unless defendants can bring this case within one of the exceptions listed in Section 4 of COGSA, 46 U.S.C. § 1304, it is entitled to recovery. This, plaintiff maintains, defendants have not done.

This case has been troubling to us because of the facial appeal of defendants' contentions. We have examined with great care all possible defenses and have constructed numerous hypothetical situations to test our result. Despite such efforts, we must find in favor of the plaintiff. We turn first to our findings of fact. This opinion constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### II. Findings of Fact

Plaintiff, Internatio, Inc., is a corporation with an office and principal place of business in New York, New York, and is engaged, *inter alia*, in the business of importing and reselling bags of cocoa beans. Defendant M/V YINKA FOLAWIYO (the YINKA) is the Nigerian vessel on which the cocoa which is the subject of this action was shipped. Defendant Nigerian Green Line Ltd. is a foreign corporation which, at all times material hereto, owned and/or operated the YINKA as a common carrier of goods by sea between ports throughout the

---

1. This point is vitiated by the parties' concession that this case is an anomaly within an anomaly, in that it is the first known case of an overweight shipment of cocoa from Nigeria. While no factual finding is necessary on this point, it was suggested at trial that the over-weight shipment might have been a result of confusion caused by a change from long to metric tons, coupled with the fact that these were old, dry beans which absorbed moisture rather than the reverse.

world, including those of Lagos, Nigeria and Philadelphia, Pennsylvania. Defendant Maritime Associates (International), Ltd. is a foreign corporation which, at all times material, was port agent at Lagos, Nigeria for defendant Nigerian Green Line Ltd. Defendants M/V YINKA FOLAWIYO and Maritime Associates (International), Ltd. were dismissed from this action for lack of evidence on motion at the conclusion of the plaintiff's case.

On six occasions in 1976 plaintiff contracted with cocoa brokers in London for the purchase of a total of 3,000 net metric tons of cocoa under the terms of a standard contract of the Cocoa Association of London, Ltd. The seller was the Nigerian Produce Marketing Board, which acts as seller for all cocoa produced in Nigeria.

In June and July of 1976, at the port of Lagos, Nigeria, 150,400 bags of cocoa beans weighing approximately 9,400 net metric tons were loaded aboard the YINKA for transportation to Philadelphia. Maritime Associates, on behalf of the Nigerian Green Line, issued twenty-five bills of lading, numbered sequentially from one to twenty-five, covering the entire shipment, the number of bags per bill of lading having been specified by the Nigerian Produce Marketing Board. All bags bore identical markings, and none were physically segregated or identified to any of the several consignees of the YINKA's cargo.

The following bills of lading subsequently came into the possession of the plaintiff in satisfaction of its contracts:

| Bill of Lading # | Number of Bags | Gross Weight | Net Weight[2] |
| --- | --- | --- | --- |
| 9 | 8,000 | 508.1648 | 500 |
| 13 | 8,000 | 508.1648 | 500 |
| 14 | 8,000 | 508.1648 | 500 |
| 16 | 16,000 | 1,016.3296 | 1,000 |
| 18 | 4,800 | 304.8989 | 300 |
| 20 | 3,200 | 203.2659 | 200 |
| TOTALS | 48,000 | 3,048.9888 | 3,000 |

No exceptions to the sound order and condition of the beans were noted on the bills of lading.[3] In fact, plaintiff contracts with its seller that it will only accept shipments carried pursuant to clean bills of lading. Each of the bills of lading received by plaintiff provided that the goods were to be out-turned in the same condition as noted thereon.

The port captain at Lagos, Nigeria, Mr. Iwenofu, testified as to the customary loading practices at the port of Lagos. His testimony showed that bags of cocoa beans are loaded individually into slings of 15 to 20 bags at the shed of the Nigerian Produce Marketing Board. At the time the slings are made up, any torn bag is removed, so that only sound bags are included. The slings are then loaded onto trucks that deliver them to the dock, from where they are hoisted onto the vessel. Although bags on the interior of the sling cannot be observed once the slings have been made up, any bag which is on the outside and which becomes torn during loading is removed. Once on board ship, the bags are stacked individually in the hold by hand, and again, any bags that may have been damaged during loading are removed. Mr. Iwenofu testified

**2.** In the cocoa trade, the containers which cause the differential between gross and net weight are the burlap or jute bags in which the beans are packed.

**3.** Testimony indicated that exceptions for damaged bags are generally not listed on bills of lading for cocoa. It is unclear, however, whether that is because only sound bags are loaded, or because a percentage of bags always breaks and cocoa traders are resigned to the fact.

further that he remembered the loading of the YINKA in the summer of 1976 because it was his first vessel, and that the customary practice was followed with the cocoa which subsequently found its way into plaintiff's possession. We credit that testimony.

Further testimony established that some bags of cocoa beans always become torn in the normal shipment because the weight of the bags, coupled with the rolling of the ship, will split weak seams; carriers employ coopers to repair those bags. Moreover, some bags are always damaged in discharge. Such losses can be reduced, however, when the bags are treated with care during carriage and discharge. Although no evidence of trade custom was presented on the point, it was established that the Nigerian Green Line routinely honors claims by consignees for losses resulting from torn bags up to the amount shown on the bill of lading.

As mentioned above, because cocoa may gain or lose weight during shipment due to a change in moisture content of the beans, the standard contract terms of the Cocoa Association of London, Ltd. allow the seller to ship an amount within 1½% of the contract weight. The contract price remains the same. Thus Internatio could have received any amount between 2,055 and 3,045 net metric tons for the same price.

■ On August 15, 1976, the YINKA arrived at the port of Philadelphia and her cargo of cocoa beans, including that portion consigned to plaintiff, was discharged by J. A. McCarthy, a stevedore engaged by defendants.[4] During discharge, it was noted by McCarthy that a number of bags of cocoa, including 521 of those belonging to plaintiff,[5] were torn and slack. Coopers employed by McCarthy were present daily during discharge in order to mend, or "recooper," these torn and slack bags.

Discharge of plaintiff's cargo of cocoa beans was completed on August 30, 1976. W. F. Sherwood & Sons, a weigher engaged by the plaintiff, weighed all of the sound bags of cocoa beans; it also weighed, separately as shown on the weight certificates, all of the torn, mended, and slack bags. A comparison of the weights of the torn, mended, and slack bags on each bill of lading with the average weight of the sound bags establishes that plaintiff received 17,026 pounds of cocoa less than it would have had it received all sound bags.

The weights listed on each of the bills of lading issued by defendants were patently inaccurate. Not only did plaintiff actually receive more than 26 net metric tons in excess of the amount noted, but further, the weights shown are identical to the fourth decimal place, indicating plainly that average weights per bag were used. The carrier did not weigh the cocoa at the time of loading.

■ Because it is clear that some amount in excess of 3,000 net metric tons of cocoa was delivered by the shipper to the carrier, because we heard testimony to the effect that the bags of cocoa, when loaded, were sound, and because plaintiff's method of adducing the weight actually shipped by comparison of the weight of the slack bags with the average weight of the sound bags

4. Defendant somewhat tentatively advances the argument that the bags in question might have been broken after discharge, but before weighing and delivery to the plaintiff, and that this possibility would absolve it from liability because its responsibility under COGSA ends upon discharge onto a fit and reasonable pier. The Harter Act, however, forbids bill of lading clauses which attempt to eliminate the carrier's duty of care, 46 U.S.C. § 190. While it is true that COGSA liability ends at discharge, COGSA in 46 U.S.C. § 1311 expressly preserves those portions of the Harter Act, 46 U.S.C. §§ 190–196, which relate to responsibilities and liabilities after discharge. Thus, once goods have been discharged onto the pier, the carrier's duty becomes that of a bailee, David Crystal, Inc. v. The Cunard Steam-Ship Co., Ltd., 339 F.2d 295 (2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965); the stevedore is the carrier's agent in that regard. The analysis, having come full circle, leaves defendant where it was before.

5. It should again be noted that the cocoa was not identified to any particular consignee until it was off-loaded; bags were pulled down at random to fill each bill of lading.

is a logical one, we find that plaintiff received 17,026 pounds of cocoa fewer than were delivered to the carrier in Lagos, Nigeria, by the Nigerian Produce Marketing Board. This amount, when added to the 3026.6229 tons actually received by plaintiff, remains within the 1½% tolerance for which the buyer and seller contracted. We find additionally that the bags which were torn were damaged while in the custody of the defendants and/or their agents, servants, and/or employees.

The stevedore, McCarthy, collected sweepings of over 30,000 pounds of cocoa apparently spilled from torn bags from the hull of the YINKA and from the pier at Philadelphia. These sweepings were sold for export, and the proceeds, over $18,600, were credited to Nigerian Green Line Ltd.'s account with J. A. McCarthy. This finding corroborates the findings in the preceding paragraph.

■ The sound market value of Nigerian cocoa beans of the type involved in this action was $1.22 per pound in Philadelphia on August 30, 1976, the date of completion of discharge. According to plaintiff's witness, Mr. Zimmermann, that is the date from which plaintiff always calculates damages for shortages, and defendants did not dispute the calculation. Thus, for reasons discussed more fully below, we find defendant Nigerian Green Line Ltd. liable in the amount of $20,771.72 as a result of its delivery of torn, mended, and slack bags and the resulting 17,026 pound shortage.

## III. *Discussion*

### A. *Plaintiff's Loss*

■ Defendant first argues that because Internatio received approximately 26 net metric tons in excess of the amount shown on the bill of lading, it has suffered no loss. This argument is unpersuasive. It is axiomatic that a buyer is entitled to receive from a carrier whatever his seller shipped, and that a carrier is bound to carry that which is delivered to it. *See* pp. 1251–1252, *infra*. In this case we have found that the Nigerian Produce Marketing Board

actually shipped approximately 3,033 tons of cocoa beans, while plaintiff received only 3,026 tons. Thus regardless of the amounts listed on the bills of lading, plaintiff plainly received less than it was entitled to receive, establishing its loss. We turn then to defendant's other contentions.

### B. *Bills of Lading*

Defendant relies most heavily on a theory of the inviolability of a bill of lading, arguing that plaintiff is not entitled to receive more than is shown on the face of the bill, and that the fact that additional cocoa may have been shipped is irrelevant. Related is the argument that the 1½% weight differential customary in the cocoa trade, *see* pp. 1248 & 1250, *supra*, applies only between seller and buyer, and that the carrier contracted only to deliver the exact amount shown on the bill of lading.

■ It is true that under § 3(4) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1303(4), the quantities listed on a bill of lading are prima facie evidence of the amounts shipped. However, prima facie evidence is by definition rebuttable. *See, e. g., Dal International Trading Co. v. the S/S MILTON J. FOREMAN*, 171 F.Supp. 794 (E.D.N.Y.1959). In order to better understand the parties' contentions in this regard, a discussion of the functions of a bill of lading is appropriate.

■■ A bill of lading for ocean carriage serves three distinct functions: it acts as a receipt for the goods shipped, it embodies the contract for the carriage of those goods, and it serves as documentary evidence of title to the goods. As a document of title, ocean bills are generally negotiable. *See* generally G. Gilmore & C. Black, *The Law of Admiralty* 93–100 (2d ed. 1974); 13 Am. Jur.2d *Carriers* §§ 277–279; 70 Am.Jur.2d *Shipping* §§ 458–464.

### 1. *The Bill of Lading as a Receipt*

■ In its function as a receipt, a bill of lading, issued by the carrier to the shipper, acknowledges that the goods listed thereon have been delivered to the carrier. In this

guise, the recitals of the bill are prima facie evidence of the quantity and condition of the goods shipped. COGSA, 46 U.S.C. § 1303(4). However, the receipt terms are not conclusive and can always be varied by extrinsic evidence. 70 Am.Jur.2d *Shipping* § 462. *See The Delaware*, 81 U.S. (14 Wall.) 579, 601, 20 L.Ed. 779 (1871); *The Lady Franklin*, 75 U.S. (8 Wall.) 325, 329, 19 L.Ed. 455 (1868); *Nelson v. Woodruff*, 66 U.S. (1 Black) 156, 17 L.Ed. 97 (1861); *Spanish-American Skin Co. v. The Ferngulf*, 242 F.2d 551 (2d Cir. 1957); *Amstar Corp. v. the S/S Naashi*, 445 F.Supp. 940 (S.D.N.Y. 1978); *Dal International Trading Co. v. the S/S MILTON J. FOREMAN*, 171 F.Supp. 794 (E.D.N.Y.1959); *H. W. St. John & Co., Inc. v. The Flying Spray*, 149 F.Supp. 737 (S.D.N.Y.1956).

In this case, plaintiff has shown that the weights recited on the bill of lading are patently incorrect; rather than actual weights, standardized weights, identical to four decimal places, were used. *See* pp. 1250–1251, *supra.* Plaintiff's method of proving the actual weight shipped by comparing the weights of the damaged bags with the average weight of the sound bags is convincing. The 30,000 pounds of sweeps remaining in the hold and on the pier provide further evidence that an amount greater than that received was shipped. We thus hold that plaintiff has met its burden of proof as to the amount of cocoa to which it is entitled.

2. *The Bill of Lading as a Contract*

In its role as a contract of carriage, a bill of lading stipulates the rights and obligations of the parties and the terms under which the goods receipted will be carried. Although these terms cannot be varied by extrinsic evidence, *see, e. g., The Delaware*, 81 U.S. (14 Wall.) 579, 601, 20 L.Ed. 779 (1871), no one has attempted to do so in this case.

The defendant has, however, attempted to argue that the plaintiff is not a party to the bill of lading in its contractual role, and that it therefore has no standing to sue thereunder. This theory is clearly incorrect. The consignee, as owner of the goods, always has a right to sue for their damage or loss. *See, e. g., The Vaughan and Telegraph*, 81 U.S. (14 Wall.) 258, 266, 20 L.Ed. 807 (1871); *The Thames*, 81 U.S. (14 Wall.) 98, 108–09, 20 L.Ed. 804 (1871); *Lawrence v. Minturn*, 58 U.S. (17 How.) 100, 106, 15 L.Ed. 58 (1854); *The North Carolina*, 40 U.S. (15 Pet.) 38, 48–49, 10 L.Ed. 653 (1841); 2A *Benedict on Admiralty* § 53.

3. *The Bill of Lading as a Negotiable Instrument of Title*

In its third aspect, a bill of lading is documentary evidence of title to the goods specified therein. Properly negotiated, transfer of the bill of lading serves to transfer title to the goods. Defendant has argued strenuously that varying the terms of such a negotiable bill would have detrimental effects on an unsophisticated downstream holder of the bill, unfamiliar with the practice of the cocoa trade and therefore unaware of the possibility of a 1½% deviation. Indeed, defendant's argument—in terrorem—is that a bill of lading is like money, and that the result advanced by plaintiff would have a serious adverse impact on the orderliness of the trade.

Troubled by this problem, we posit the following hypothetical situation. Suppose that a chocolate factory in Hershey, Pennsylvania, orders 3,000 tons of raw cocoa to be delivered through the Port of Philadelphia. Suppose further that a strike at that plant makes it impractical for the original consignee to accept the cocoa, so the bill of lading is transferred to a Harrisburg bank in partial satisfaction of a loan. The Harrisburg bank, knowledgeable about the cocoa trade because the chocolate factory is its largest customer, nonetheless has no need for 3,000 tons of cocoa, so transfers the bill to an Arkansas investor who is a chocolate addict and thinks it would be fun to invest in cocoa beans, but who soon realizes he is in over his head. The Arkansas investor, through his equally unsophisticated rural bank, transfers the bill to a broker in Mexico City who deals in cocoa on a

regular basis. The Mexican broker's grapevine tells him that the consignor had shipped 3,033 tons of cocoa rather than the 3,000 listed on the bill of lading. The question then arises whether the Mexican investor can sue the Arkansas investor, occasioning suits back along the chain.

 However, as stated by the Supreme Court:

> A bill of lading is an instrument well known in commercial transactions, and its character and effect have been defined by judicial decisions. In the hands of the holder it is evidence of ownership . . of the property mentioned in it, and of the right to receive said property at the place of delivery. Notwithstanding it is designed to pass from hand to hand, . . it is not a negotiable instrument or obligation in the sense that a bill of exchange or a promissory note is. Its transfer *does* not preclude . . . all inquiry into the transaction in which it originated, because it has come into hands of persons who have innocently paid value for it. The doctrine of *bona fide* purchasers only applies to it in a limited sense.

*Pollard v. Vinton*, 105 U.S. 7, 8, 26 L.Ed. 998 (1881). *See also* 70 Am.Jur.2d *Shipping* § 464. Thus the transferee takes whatever title is held by the transferor, including any rights or liabilities attached thereto. The right which is passed with the bill of lading in the instant case is a cause of action against the carrier, on the bill of lading, for delivery of the cocoa delivered to it and which it transported pursuant to that bill. Only the carrier has had physical contact with the cocoa, which remains on the pier at Philadelphia. An action will lie only against the carrier, and can be brought by the party with title to the cocoa, *i. e.*, the ultimate holder of the bill of lading. If in our hypothetical case the Mexican broker were to sue the vessel, the vessel could not claim prejudice.

A further problem, as between parties in the chain of transfer, is whether differing amounts might have been paid for the bill of lading depending on the actual amount of cocoa shipped, and whether an unsophis-

ticated buyer would therefore be at a disadvantage. This argument assumes, however, that cocoa bills of lading somehow find their way into Aunt Tillie's portfolio, a suggestion which we consider unlikely. A buyer of a bill of lading such as that under consideration here is much more likely to be a cocoa or other commodity broker or a financial institution with the expertise and resources necessary to discover the custom in the cocoa trade. Thus we do not consider this possibility a persuasive argument for denying plaintiff's recovery.

 Despite all its various arguments, the fact remains that defendant has cited no case, and we have found none, which refuses to allow a party to present evidence which would vary or contradict the receipt aspects of a bill of lading. Because the plaintiff has shown that 3,033 net metric tons of cocoa beans packaged in sound bags were loaded onto the M/V YINKA FOLA-WIYO, it is entitled to recover from the carrier the difference between that amount and the amount received.

## C. *Adequacy of Packaging*

 Despite the holding above, defendant can escape liability for plaintiff's loss if it can show that the loss was caused by one of the exceptions listed in 46 U.S.C. § 1304. The Nigerian Green Line has therefore attempted to show that the damage was a result of some inherent vice in the product, 46 U.S.C. § 1304(2)(m), or of insufficient packaging, 46 U.S.C. § 1304(2)(n). To that end, evidence was presented to the effect that it is a normal occurrence for cocoa bags to break during shipment, and that this is an anticipated peril in the trade. Indeed, it has been so found. Because it is not the cocoa itself which leads to the loss, the inherent vice theory is inapposite. The packaging theory, however, merits consideration.

In *Bache v. Silver Line, Ltd.*, 110 F.2d 60 (2d Cir. 1940) (L. Hand, J.), the carrier was found not liable for damage to a cargo of rubber where the evidence showed that the rubber was stowed in the customary manner and there was no evidence that that

custom was unreasonable. The decision was presented as a compromise, where both parties knew the goods would be "somewhat exposed" and the shipper could have specified a different method. In *The Rita Sister*, 69 F.Supp. 480 (E.D.Pa.1946), the carrier was exempted under 46 U.S.C. § 1304(2)(n) from liability for breakage to a number of bottles of a cargo of brandy, when the evidence showed that the brandy had come aboard in sound condition and was carefully stowed. In another brandy case, *Kasser Distillers Products Corp. v. Companhia de Navegacao Carregadores Acoreanos*, 76 F.Supp. 796. (S.D.N.Y.1948), the carrier was absolved from liability for breakage despite evidence that the bottles were packed according to the custom at the time, because the custom did not necessarily establish sufficiency of packaging.

At first glance, these cases would seem to lead to the conclusion that the Nigerian Green Line could at least arguably escape liability for damage to this cargo of cocoa. However, sufficiency of packaging is a factual issue, to be decided anew in each case, with the carrier having the burden of proof. *See, e. g., Lekas & Drivas, Inc. v. Goulandris*, 306 F.2d 426, 429 (2d Cir. 1962). In the case at bar, the Nigerian Green Line has undermined its own argument by admitting liability for loss due to torn, mended, and slack bags up to the amount shown on the bill of lading. By regularly employing coopers to resew torn bags and by recognizing claims for shortages, the Line has shown by their own practices that they do not consider the normal mode of cocoa packaging deficient, or at least liability-producing. Nor have they shown that this particular shipment was packed in a manner more slipshod than the normal, for cocoa beans are apparently always shipped in jute or burlap bags. The cases cited above are thus distinguishable,

and defendant's argument on insufficiency of packaging must fail.

### IV. *Conclusion*

As we noted at the outset, we sympathize with defendant's concern for standardization and predictability in negotiable bills of lading. Nonetheless, we are unpersuaded by defendant's in terrorem arguments,[6] and find that plaintiff has successfully established a shortage of 17,026 pounds of cocoa beans, with a corresponding loss of $20,771.72.[7] An appropriate order follows.

---

**6.** We do note too that this is an anomalous case, *see* n.1, *supra*, the rare nature of which should serve to prevent defendant's feared disruption of the orderly maintenance of the cocoa trade.

**7.** Plaintiff has in various pleadings and memoranda listed its loss as $21,043.78; $20,941.98;

and $20,771.72. The $20,941.98 figure represents the loss which would have occurred had the sound market value of cocoa on the relevant day been $1.23 per pound; we have, however, found the market value to have been $1.22 per pound. No evidence was presented to support the $21,043.78 figure.